## UNITED STATES v. READING CO. et al.

(District Court, E. D. Pennsylvania. July 3, 1915. Supplemental Opinion, October 27, 1915.)

### No. 1095.

1. MONOPOLIES ⬤⟹16—COMBINATIONS IN VIOLATION OF SHERMAN ACT—LEASE OF COAL ROADS.

The Lehigh Coal & Navigation Company was the owner of mines and a large acreage of coal lands in the anthracite regions of Pennsylvania, and of a railroad, 180 miles long, with its branches, to which its mines were tributary, and which extended to the Delaware river, where it connected with other roads, including that of the Central Railroad Company of New Jersey. In 1871 it leased its road for a long term to the Central Company, to receive as rental one-third of the gross earnings of the leased road, afterward modified by fixing a maximum and minimum annual rental. It also agreed to ship all of its coal, with the exception of one-fourth of its production, in the Wyoming region, over the lines of the Central Company whenever destined to points which could be reached wholly or partly over such lines. Such lease is still in force. *Held*, on the evidence, that it was not intended to and did not operate to create monopoly or to restrain competition, in violation of Sherman Anti-Trust Act July 2, 1890, c. 647, §§ 1, 2, 26 Stat. 209 (Comp. St. 1913, §§ 8820, 8821), either in the production and sale or the transportation of coal, but that, under the circumstances existing at the time it was made, it was a proper business arrangement, advantageous to both parties, by securing to the coal company, whose mines were reached only by the leased lines, a permanent outlet for its coal to the seaboard and elsewhere, which ever since enabled it to compete with other producers, and to the railroad company, a permanent share of the coal of the region for transportation, which it was in danger of losing through combinations and traffic arrangements between other roads.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 12; Dec. Dig. ⬤⟹16.]

---

⬤⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

2. MONOPOLIES ⬧⟶16—COMBINATIONS IN VIOLATION OF SHERMAN ACT—RAILROAD AND COAL COMPANIES.

A combination of a coal-mining company and a railroad company, by whose line the coal of the mining company can be transported from the mines, through the medium of a holding company which owns the stock of both other companies, is not necessarily unlawful, as in violation of Sherman Anti-Trust Act July 2, 1890, c. 647, §§ 1, 2, 26 Stat. 209 (Comp. St. 1913, §§ 8820, 8821), unless unlawful methods or practices are resorted to, which tend to create a monopoly or restrain competition.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 12; Dec. Dig. ⬧⟶16.]

3. MONOPOLIES ⬧⟶13—COAL-MINING COMPANY—EXTENT OF HOLDINGS AND BUSINESS—"MONOPOLY"—"RESTRAINT OF TRADE."

The facts that a coal-mining company, under the sanction of state laws, has acquired and holds large bodies of coal lands far in excess of its present mining needs, and that it mines and sells a large percentage of all the anthracite coal produced, do not of themselves constitute a monopoly or restraint of trade, in violation of Sherman Anti-Trust Act July 2, 1890, c. 647, §§ 1, 2, 26 Stat. 209 (Comp. St. 1913, §§ 8820, 8821).

[Ed. Note.—For other cases, see Monopolies, Dec. Dig. ⬧⟶13.

For other definitions, see Words and Phrases, First and Second Series, Monopoly; Restraint of Trade.]

4. MONOPOLIES ⬧⟶20—COMBINATION IN VIOLATION OF SHERMAN ACT—COAL COMPANIES.

The Reading Company, which owned all of the stock of the Philadelphia & Reading Railway Company and of the Philadelphia & Reading Coal & Iron Company, a large producer of anthracite coal, bought a controlling interest in the Central Railroad Company of New Jersey, which also owned the greater part of the stock of the Lehigh & Wilkes-Barre Coal Company. The two railway companies did not compete in the carriage of coal, because their lines extended into different parts of the mining region and reached different mines; but the two coal companies together mined and sold 20 per cent. of the total production of anthracite coal, and the same was sold largely in the same markets. *Held*, that the uniting of such companies in the same ownership created a combination in restrain of interstate trade, in violation of Sherman Anti-Trust Act July 2, 1890, c. 647, § 1, 26 Stat. 209 (Comp. St. 1913, § 8820).

[Ed. Note.—For other cases, see Monopolies, Dec. Dig. ⬧⟶20.]

5. MONOPOLIES ⬧⟶16—INTERSTATE COMMERCE ACT—COMMODITIES CLAUSE—INTEREST OF CARRIER IN COMMODITY TRANSPORTED.

The Philadelphia & Reading Coal & Iron Company was incorporated in 1871 as a subsidiary company by the Philadelphia & Reading Railroad Company to take over and operate coal properties which the railroad company had purchased or desired to purchase. In 1896, when both companies were in the hands of receivers, a reorganization was effected. The property of both companies was sold. Most of the railroad property was conveyed by the purchasers to the Philadelphia & Reading Railway Company, organized for the purpose, while the coal property was reconveyed to the coal and iron company. The capital stock of both these companies was issued to the Reading Company, a holding corporation, which has since continued to own practically all of the same. Since that time, while there has been a common ownership of the two companies and to some extent common directorates, their operating departments and officers have been entirely separate, and the business between them has been conducted at arms' length. The railway company has charged the coal company customary rates for the carriage of its coal, without discrimination, and has purchased and paid for all coal for its own use. *Held*, that the railway company did not mine or produce the coal transported for the coal company, nor did it own or have any inter-

---

⬧⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

est, direct or indirect, in such coal, which rendered its transportation of the same unlawful, under the commodities clause of the Interstate Commerce Act, as added to Hepburn Act June 29, 1906, c. 3591, § 1, 34 Stat. 585 (Comp. St. 1913, § 8563, cl. 6).

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 12; Dec. Dig. ☞16.]

In Equity. Suit by the United States against the Reading Company and others. On final hearing. Decree for the United States in part, and in part for the defendants.

J. C. McReynolds, Atty. Gen., G. Carroll Todd, Asst. Atty. Gen., and Thurlow M. Gordon, Sp. Asst. Atty. Gen., for the United States.

Robert W. De Forest and Wm. A. Barkalow, both of New York City, for defendants Central R. Co. of New Jersey.

Jackson E. Reynolds, of New York City, for defendants Reading Co., Philadelphia & R. R. Co., and Philadelphia & R. Coal & Iron Co.

Henry S. Drinker, Jr., Abraham M. Beitler and John G. Johnson, all of Philadelphia, Pa., for defendant Lehigh Coal & Navigation Co.

Wm. Jay Turner and John G. Johnson, both of Philadelphia, Pa., for defendant Lehigh & N. E. R. Co.

Before BUFFINGTON, HUNT, and McPHERSON, Circuit Judges.

McPHERSON, Circuit Judge. This action was begun in September, 1913, and is the successor of an earlier action brought in 1907, which was decided by this court in 1910 (183 Fed. 427), and by the Supreme Court in 1912 (226 U. S. 324, 33 Sup. Ct. 90, 57 L. Ed. 243). The suit of 1907 was brought against six of the railroads that reach the anthracite coal field of Pennsylvania, with certain coal companies and other defendants. It rested entirely on the Anti-Trust Act of 1890; the commodities clause of 1906 was not involved. The result of the suit was to declare two transactions unlawful—a combination through the Temple Iron Company to prevent the construction of a railroad, and a class of contracts known as the "65 per cent. contracts" —while the principal complaint of the government, namely, that the carriers had combined to distribute the coal tonnage among themselves, was not sustained.

But, as a part of the general combination charged to exist among the carriers, the government had averred that several minor combinations had been made, and upon the existence and the lawfulness of these the Supreme Court did not pass, declaring that if such combinations had been made they must be separately attacked, and therefore dismissing the bill as to them, but without prejudice to the government's right to sue them in detail. The action now before us undertakes to prove the existence of one of these combinations, although the charge made in the suit of 1907 has now been expanded so as to embrace other transactions and other defendants than were embraced by that proceeding. The situation is complicated, and may be difficult to state with clearness. It may perhaps simplify matters if we premise some

general statements before taking up the government's case and the various answers thereto.

The present proceeding in equity declares its object to be: (1) To prevent the defendants "from further restraining and monopolizing, or attempting to monopolize, interstate and foreign trade and commerce, especially in anthracite coal, in violation" of the Anti-Trust Act of 1890; and (2) to prevent some of the defendants "from transporting in interstate or foreign commerce anthracite coal (not intended for their use as common carriers) mined or produced by them, etc., in violation" of the commodities clause of the act of 1906.

Confining ourselves for the present to the alleged violation of the act of 1890, we note that the subject-matter of the litigation is the interstate and foreign trade in anthracite coal. The coal in question is produced solely from the Pennsylvania deposit, which in the light of our present knowledge seems to be unique. The United States has never owned or controlled it; the present landowners derive their title either from the Penns or from their successor, the commonwealth of Pennsylvania. What kind of regulation the state might have put in force over this mineral asset, if its value had been realized a century ago, and if the views now current in many quarters about the conservation of natural resources had then prevailed, is purely a matter of academic speculation. What actually happened was this: By gradual degrees anthracite coal came to be recognized as an excellent fuel, and thereupon the attention of private capital, always in search of profitable undertakings, was attracted thereto. The region was wild and unsettled, and the state desired to see it developed and was willing to offer inducements to that end. As a result, many persons acquired coal lands for small sums under the liberal land laws of Pennsylvania, and various mining and transporting enterprises were promoted, usually under the direct encouragement and authority of state legislation. Obeying an inevitable tendency, the ownership of these lands in the course of years passed into the hands of a comparatively small number of individuals and corporations, so that now, although there are still many smaller owners, the great bulk of the deposit belongs to a few large corporate producers. The agencies of production and transportation have been vastly improved and multiplied, and the use of the fuel has become so widespread that many industries and a very large number of homes are now greatly interested in the way the owners deal with their property.

The general situation from the point of view of the large coal-carrying and coal-producing companies was thus summarized by Judge Gray in the first Reading Case, 183 Fed. at page 437:

"As appears from the undisputed testimony of the defendants, these present holdings of coal lands have resulted from acquisitions made through a long period of years by the companies named respectively, or their predecessors in title, beginning, in the case of some of the largest holders and in respect to the larger part of the acquisition, long prior to 1874. The gradual growth of these acquisitions and the consequent development of the present situation, it is contended by the defendants, have been induced by natural causes, such as the geographical and topographical features of the anthracite coal region, which have presented serious obstacles to the construction of railroads with which it was sought to penetrate the different coal fields of

the anthracite region, and which have enhanced enormously the cost of their construction; that in the earlier periods of the development of this region, when the mines and the production of coal were more largely in the hands of individuals and small corporations, the business of mining and marketing coal was wasteful and often resulted largely in the failure or bankruptcy of those concerned therein. The individual exploiter skimmed the cream, so to speak, of his coal lands, and, unable to meet the expense of practicing the economies necessary to their full development, the mines were not infrequently abandoned, and of this abandonment, deterioration or ruin was the natural result; that, latterly, the recurrence of strikes and labor troubles have contributed to the difficulties of the situation; that these strikes and labor troubles extended to all the coal-mining and coal-shipping operations of the whole region, affecting all producers, great and small alike, and that the solidarity of the labor unions compelled a joint agreement, embracing all engaged in mining operations as to the terms of settlement; that since the last settlement in 1902–03, there has resulted a condition of comparative industrial peace in the anthracite region; that this condition, together with the increased demand for and the consequent increased price of coal have regulated, without destroying, the natural competition of the great carrying and producing companies; that many economies in the production and sale of coal have been made possible, wasteful production largely done away with, and, more than all, a wise and scientific conservation of the future supply of this necessity of modern life has been brought about, to the infinite advantage of the public and of those connected with the production of coal, whether as capitalists or laborers.

"It is further urged by the defendants that the destruction of present conditions and methods attending the production and sale of coal will produce a deplorable anarchy in the trade, and involve in confusion and financial loss all those engaged therein, a confusion and loss by which the consumer is bound to suffer."

We think the contentions then made fairly state many of the facts, and in the present case we may say of them, as was said by Judge Gray, that while they are not decisive they are pertinent because their importance challenges the court's careful consideration of the question at issue. When we consider that some of the defendants ship coal to almost all the states and to three foreign countries, we obtain some conception of the magnitude of the trade, and the need of caution in dealing with so vast a subject.

The government is not making any attack on the title by which the defendants hold the lands they own in the Pennsylvania region, nor does it seek directly to divest or disturb their enjoyment thereof. The bill does not complain of the method (in and of itself) by which the title is held, and it does not complain of the methods of producing and distributing the coal, so far as these methods are confined to transportation and sale within the state. Neither is the government complaining of the mere amount of the defendants' holdings, or of the mere extent of their business; the act of 1890 has not declared either such amount or such extent to be unlawful, in and of itself; the act is directed simply against unreasonable restraint of interstate and foreign trade, and neither the amount of the defendants' holdings, nor the extent of their business, is relevant to the present inquiry except for the light that may be thrown thereby upon the effect of the defendants' conduct on interstate and foreign trade. In a word, we must keep steadily in view the only legitimate object of the proceeding—namely, to show by evidence that the trade referred to has been unreasonably restrained; and we think the investigation falls

naturally into two principal divisions: (1) Whether production has been unreasonably restrained; and (2) whether a similar restraint appears in respect to the sale of the product.

With these preliminary remarks, let us turn to the bill and answers, summarizing them as much as possible, in order to see what questions are presented, and to obtain some idea of their relative importance. Approximations are used throughout, and in the first instance we shall state the facts with special reference to the alleged violations of the act of 1890. There is little dispute over the facts; the controversy is over the proper inferences to be drawn therefrom.

The bill, or petition, charges as follows:

### Subject of the Litigation.

As already stated, the subject is the interstate and foreign trade in anthracite coal from the Pennsylvania field. The larger sizes are extensively used for domestic purposes throughout the New England and Middle Atlantic states, and to a less extent in other sections of the country and in Canada. Small sizes are much used for steam purposes, mainly in the larger cities of the East. In recent years the average annual production has been 75,000,000 tons; in value it is third among the mineral products of the United States. Little anthracite is known to exist, except in northeastern Pennsylvania, where the deposit is by far the largest and most valuable. It is found in several adjoining counties and underlies an area (not always contiguous) of about 310,000 acres, or 484 square miles. At its nearest points, the field is 90 miles from Philadelphia, 140 miles from New York, 250 miles from Pittsburgh, and 265 miles from Lake Erie at the port of Buffalo. In some aspects there are four divisions of the field, but for trade purposes there are only three. From north to south, they are known as the Wyoming region, 176 square miles in area, the Lehigh region, 45 square miles, and the Schuylkill region, 263 square miles. Scranton and Wilkes-Barre are the principal cities in the first; Hazleton, in the second; Pottsville, in the third. Two varieties of anthracite are produced, white ash and red ash, these being further subdivided; the Wyoming and the Lehigh regions produce the white ash almost wholly, while the Schuylkill region produces both varieties.

In the earliest years of the industry the only transportation was by river or canal. But the railroad soon supplanted these agencies, and now carries nearly all the output of the mines to market. Ten railroads enter the field, namely:

(1) The Reading Railroad, which runs from the Schuylkill and the Lehigh regions to Philadelphia, and thence through New Jersey to Port Reading on New York Harbor.

(2) The Central Railroad, which runs from the Wyoming and the Lehigh regions, through Pennsylvania and New Jersey, to Port Johnston, Elizabethport, and Jersey City, all on New York Harbor.

(3) The New England Railroad, which runs from the Lehigh region to Campbell Hall, N. Y., connecting there with the systems of the New York Central and of the New York, New Haven & Hartford.

(These three railroads are parties defendant; the remaining seven are not.)

(4) The Lehigh Valley Railroad, which runs from all the regions to Perth Amboy and Jersey City, both on New York Harbor, and also to Lake Erie.

(5) The Pennsylvania Railroad, which also reaches all the regions.

(6) The Delaware, Lackawanna & Western Railroad, which runs from the Wyoming region to Hoboken, on New York Harbor, and also to Buffalo.

(7) The Erie Railroad, which runs from the Wyoming region to Weehawken, on New York Harbor, and also to Buffalo.

(8) The New York, Susquehanna & Western Railroad, which runs from the Wyoming region to Edgewater, on New York Harbor.

(9) The New York, Ontario & Western Railroad, which runs from the Wyoming region to tidewater at Cornwall, on the Hudson river, and at Weehawken, on New York Harbor, and also to Oswego, on Lake Ontario.

(10) The Delaware & Hudson Railroad, which runs from the Wyoming region in a northerly direction.

It will thus be seen that eight railroads reach the Wyoming region, five reach the Lehigh region, and three reach the Schuylkill. All of these eight railroads have been operating in the field since 1870 at least; of the other two, one entered it directly in 1882 and directly in 1894, and the other entered in 1890.

Two lines of canals also are still in existence and do some business.

(1) The Schuylkill Canal, which follows the Schuylkill river from Port Clinton to Philadelphia, and is owned and operated by the Schuylkill Navigation Company.

(2) The Lehigh Canal and its continuation, the Delaware Division Canal, which follow the Lehigh and the Delaware rivers from Coalport (or Mauch Chunk) to Easton and thence to Bristol. These canals are operated by one of the defendants, the Lehigh Navigation Company.

All the railroads mentioned, except the New England and the Delaware & Hudson, reach New York Harbor, and that point receives about 25 per cent. of the total tonnage shipped from the mines. The freight rate is substantially the same over each road. New York Harbor is the largest market and point of distribution, all the coal terminals being on its western shore in New Jersey. Running from north to south, they are as follows:

At Edgewater, the terminal of the New York, Susquehanna & Western.

At Hoboken, of the Delaware, Lackawanna & Western.

At Weehawken, of the Erie, and also of the New York, Ontario & Western.

At Elizabethport and at Port Johnston, of the Central Railroad.

At Port Reading, of the Reading Railway.

At Perth Amboy, of the Lehigh Valley.

At South Amboy, of the Pennsylvania.

At these terminals, the coal is screened, weighed, dumped into barges, and sold free on board. From the three upper terminals the freight

charge to a dock in New York is about 15 cents a ton. From the remaining and more distant terminals it is 5 cents more, but the selling price at the terminals is 5 cents a ton less, so that the price in New York City is the same, whether the coal comes from one terminal or another. Some of the coal shipped to New York Harbor is not transferred to barges, but remains in the cars, these being towed on car floats to or toward points of destination.

After New York Harbor, Philadelphia is the most important market. It is served by the Reading Railway and by the Pennsylvania Railroad, and is a point from which a large quantity of coal is distributed by water, most of it going to New England.

Of the total production of anthracite, about 12 per cent. is consumed locally; of the remaining 88 per cent. about one-fifth finds a market in Pennsylvania, and four-fifths elsewhere.

Taking the latest figures that are available—for 1905—the shipments from the mines were distributed to the following points:

|  | Tons. | Per Cent. |
|---|---|---|
| Pennsylvania | 11,520,383 | 18.76 |
| New York | 18,125,419 | 29.52 |
| New Jersey | 7,212,341 | 11.74 |
| New England states | 8,692,504 | 14.15 |
| Southern states | 2,080,088 | 3.39 |
| Western states | 6,904,314 | 11.24 |
| Pacific coast | 1,743 | .002 |
| Canada | 2,187,450 | 3.56 |
| Other foreign countries | 42,533 | .07 |
| Supply coal to railroads | 4,643,426 | 7.56 |
| Total | 61,410,201 | 100.00 |

These proportions are probably still maintained, although the annual production has been increased by 10,000,000 tons or more.

## General Description of Defendants.

The Reading Company—called herein the Holding Company—is a Pennsylvania corporation created in 1871 with extensive powers that need not be enumerated. Its general office is in Philadelphia, and its present name was adopted in 1896. In November and December of that year its capital stock of $100,000 was increased to $140,-000,000, divided into three classes, and all the stock has been issued. Its funded debt is $130,000,000.

The Philadelphia & Reading *Railway* Company—called the Reading Railway—is the successor of the Philadelphia & Reading *Railroad* Company. It is a Pennsylvania corporation created in November, 1896, with a capital stock of $20,000,000, afterwards increased to $42,500,000, and a funded debt that is now $50,000,000. Since December 1, 1896, it has been operating a system of railroads that extends southeasterly from the Schuylkill region of the coal field, through Reading, to Philadelphia, Port Richmond, and Wilmington, all on the Delaware river. From Philadelphia its line runs northeasterly, through Bound Brook, to Port Reading, on New York Harbor. It is also operating barges and other vessels from Port Richmond to the principal

ports of New England from Long Island Sound to Maine; and it operates similar vessels from Port Richmond to the general neighborhood of New York. Since 1896 and 1900 it has connected at Philadelphia and at Wilmington with the Baltimore & Ohio Railroad, thus forming a through route from the anthracite field to Baltimore and Washington. Since 1896 it has connected at Newberry Junction, Pa., with the New York Central Railroad, thus forming a through route to points on the latter road between Lake Erie and the Hudson river, and between Albany and Boston. At Rotterdam Junction, N. Y., it connects with the Boston & Maine Railroad, which reaches points in central and northern New England. To the points thus reached by its own lines, or by these connections, it carries large quantities of general merchandise, and of coal, both bituminous and anthracite.

The Philadelphia & Reading Coal & Iron Company—called the Coal & Iron Company—is a Pennsylvania corporation, created in 1871. Its present capital stock is $8,000,000, and its debt is more than $74,-500,000. Both before and since 1901 it has owned or leased about 98,500 acres of coal-bearing lands in the Schuylkill region, containing many million tons of coal, and has shipped the coal taken from these lands, and the coal bought from other producers, to many Eastern, Southern, and Western markets.

The Central Railroad Company of New Jersey—called the Central Railroad—is a New Jersey corporation created in 1847. Its present capital stock is $27,500,000, and its funded debt $48,000,000. Since before 1901 it has operated as owner or lessee a railroad system that extends from the Wyoming and the Lehigh regions easterly across Pennsylvania and New Jersey (via Phillipsburg opposite Easton on the Delaware River) to Port Johnston, Elizabethport, and Jersey City —three points on New York Harbor—and extends also from Newark, N. J., southerly to Delaware Bay. It has extensive power to build and operate branches. Since before 1901 it has also been operating barges and other vessels from Port Johnston and Elizabethport to New York City and to ports on Long Island Sound and in New England; and it also operates car floats from Jersey City to New York City and to other points not far away. Before and since the same year its system has had the following connections:

(1) At Phillipsburg, it connects with the Pennsylvania Railroad System, thus forming a through route from the anthracite field to Philadelphia, Wilmington, Baltimore, and Washington.

(2) At Easton, it connects with the Lehigh & Hudson River Railway, this road in turn connecting at Maybrook, N. Y., with the system of the New York, New Haven & Hartford Railroad, thus forming a through route from the anthracite field to points in central and southern New England.

(3) Near Slatington, on the Lehigh river, and at Northampton and at Bethlehem Junction, it connects with the Lehigh & New England Railroad, this road in turn connecting at Campbell Hall, N. Y., with the system of the New York, New Haven & Hartford Railroad, thus forming another through route from the anthracite field to points in central and southern New England.

(4) At Sterling Junction, and at Weehawken, it connects with the West Shore Division of the New York Central Railroad—the West Shore in turn connecting at West Albany with the Boston & Albany Division of, the New York Central, and connecting also at Rotterdam Junction with the Boston & Maine Railroad—thus forming through routes from the anthracite field to points along the Hudson river and between Albany and Boston, and to Boston and Portland and other points in central and northern New England.

(5) At Sixtieth Street, New York City, via car floats from Jersey City, it connects with the main division of the New York Central, forming a through route from the anthracite field to points on that system along the Hudson and elsewhere.

Over these routes it has carried much traffic of all kinds, including anthracite in large quantities, to New York Harbor, Long Island Sound, and New England, from Long Island Sound to Maine, and also to many other points reached either by its own lines or by the lines of the connecting carriers already named.

The Lehigh & Wilkes-Barre Coal Company—called the Wilkes-Barre Coal Company—is a Pennsylvania corporation created in 1874 by the merger of two other companies. Its present capital stock is more than $9,000,000, and its funded debt is nearly $17,000,000. Since prior to 1901 it has owned or leased nearly 16,000 acres of coal-bearing lands—13,500 acres being in the Wyoming region, and the rest in the Schuylkill region. These lands contain many million tons of anthracite. It has mined for many years, buying also from other producers, and has shipped and sold the coal chiefly, but not wholly, in the Eastern markets from New York to Maine, reaching Philadelphia also and some points farther south.

The Lehigh Coal & Navigation Company—called the Lehigh Navigation Company—is a Pennsylvania corporation created in 1822, originally to hold lands, and to build a canal and slack-water navigation along the Lehigh river. Afterwards it was authorized to build certain lines of railroad. Its capital stock is more than $26,000,000, and its funded debt is more than $21,000,000. It built and still owns and operates the Lehigh Canal, which runs for 46 miles along the Lehigh river from Coalport (or Mauch Chunk) to Easton; and it leases the Delaware Division Canal, which connects with the Lehigh Canal and runs for 60 miles along the Delaware river from Easton to tidewater, at Bristol, 18 miles above Philadelphia. These two canals thus form a continuous line from the anthracite field to tidewater, and the Lehigh Navigation Company has operated them for many years as a common carrier, anthracite being the principal freight. Its railroad is the Lehigh & Susquehanna Railroad, about 180 miles long with tributaries and branches, which runs from Phillipsburg northwesterly through Pennsylvania, touching the Schuylkill and the Lehigh regions and penetrating the Wyoming region as far as Wilkes-Barre and Scranton. It has long controlled by ownership or otherwise more than 13,000 acres of coal-bearing lands in the Lehigh region, containing many million tons, the annual production being nearly 4,000,000 tons. Its coal is shipped mainly to Eastern markets, including New York City

and its neighborhod, points in New England from Long Island Sound to Maine, and points from Philadelphia to Washington. It formerly owned also more than 5,000 acres of coal-bearing lands in the Wyoming region, these being acquired after the construction of the Lehigh & Susquehanna Railroad. It owns and operates (until recently) a gathering line, the Panther Creek Railroad, which collects the product of its mines and connects at Hauto with the lines of the Central Railroad, and connects also at Tamaqua with the lines of the Reading Railway and of the Lehigh & New England Railroad. Almost all the Navigation Company's coal reaches market by these two connections at Hauto and at Tamaqua.

The Wilmington & Northern Railroad Company is a Pennsylvania-Delaware corporation created in 1877. Its present capital stock is $1,500,000, and its funded debt is $894,000. Its railroad, 72 miles long, runs from Wilmington, through Coatesville, to a point near Reading, reaching that city over the rails of the Reading Railway. At Reading, it connects with the Pennsylvania Railroad and the Reading Railway, thus forming two through routes from the anthracite field to tidewater at Wilmington. Until February 1, 1900, it operated the line from Reading to Wilmington, carrying anthracite as its principal freight.

The Lehigh & Hudson River Railway Company—called the Hudson River Railway—is a New York-New Jersey corporation created in 1882. Its present capital stock is $1,340,000, and its funded debt is $3,230,000. Since before 1901 it has operated a railroad from Easton to Maybrook, N. Y. At Easton it connects with the Central Railroad, the Lehigh Valley Railroad, and the Delaware, Lackawanna & Western Railroad (the last two companies not being parties to this action). From Easton it runs through Belvidere (where it makes another connection with the Lackawanna road) to Maybrook, where it connects with the system of the New York, New Haven & Hartford, thus forming a through route from the anthracite field to points in central and southern New England. It also reaches Campbell Hall, N. Y., where it connects with the New York Central System, thus forming a through route from the coal field to points on that system. About 20 per cent. of its tonnage is anthracite.

The Lehigh & New England Railroad Company—called the New England Railroad—is a Pensylvania-New Jersey corporation. Its present capital stock is $1,000,000, and its funded debt is $8,000,000. Its road runs from several points in Pennsylvania to Campbell Hall. In Pennsylvania, it connects at Tamaqua, in the Schuylkill region, with the Reading Railway, and with the Panther Creek Railroad of the Lehigh Navigation Company; at Slatington, with the Lehigh Valley Railroad; and at a point opposite Slatington, and also at Northampton, and at Bethlehem Junction, with the Central Railroad. At Campbell Hall, it connects with the systems of the New York Central, and of the New York, New Haven & Hartford, thus forming a through route to points in New York and in central and southern New England. About 16 per cent. of its tonnage is anthracite.

The individual defendants have been made parties to the bill in

their character as officers or directors of some of the corporations defendant.

## Charges against Defendants.

The charges against the defendants must be much condensed. The transactions attacked are divided into three classes: The first, comprising acts and agreements before 1896; the second, those from 1896 to 1901; and the third, those from 1901 onward. This is the general division, although occasional overlapping may take place.

*Before 1896.*

1. Transactions of the Reading *Railroad* with the Coal & Iron Company:

The Reading *Railway* was not chartered until the latter part of 1896. Before that time, its main line and branches (with some exceptions) were operated by the old Reading *Railroad,* a Pennsylvania corporation created in 1833. About 1871 the Railroad Company undertook to control in some measure the production of anthracite along its lines. It announced the policy in that year, stating its reasons to be the serious interruption of its business by strikes and the alternate periods of expansion and depression in the trade, and stating, also, that the policy could probably be best carried out without injuring individual interests if the Railroad became the owner of coal lands along its branches. Accordingly it had already bought 70,000 acres, and had borrowed and spent for this purpose $12,000,-000. But the Railroad's charter restricted it to the business of a common carrier, and therefore the Coal & Iron Company, incorporated in the same year, took over the lands already purchased. The whole capital stock of the Coal & Iron Company was owned by the Railroad. Within a short time the Coal & Iron Company began to mine and sell coal, shipping to market over the Railroad. Assuming the original motive to be as stated, the government contends that the Railroad soon expanded its policy, intending to control, not merely enough lands to secure a fair share of tonnage, but enough to control production in the Schuylkill region and to monopolize transportation therefrom. In support of this contention, the bill cites the report of an investigating committee appointed in 1885 by the Railroad's stockholders, in which the original policy is declared to have grown into a policy to prevent competition and to secure control, in evidence whereof the committee refers to the acquisition of 20,000 additional acres in 1874. Citation is also made from the Railroad's report for 1881, which states the object of the policy to be the control of the entire production in that region, as well as the control of iron production in the Schuylkill Valley.

Pursuing this policy (the bill goes on), the Railroad furnished money and credit in large amounts to the Coal & Iron Company, wherewith the latter acquired shipping and marketing facilities, additional coal lands, and the shares of other coal-owning and coal-mining companies. But this policy of buying a large acreage was costly and injudicious, much of the land remained undeveloped and unproductive, and serious loss often resulted—the aggregate thereof

being several million dollars, which was paid by the Railroad directly or indirectly. By September, 1896, the Railroad had advanced more than $65,000,000, none of which had been repaid. Moreover, the Railroad had guaranteed $12,000,000 of the Coal & Iron Company's bonds, on which it often paid $1,000,000 a year for interest and sinking fund charges. The Railroad received no interest on any of its advances. Further, the Railroad remitted several million dollars of freight charges against the Coal & Iron Company.

By these financial favors—namely, the advance of money and credit without interest, the payment of losses and of interest on the Coal & Iron Company's bonds, and the remission of freight charges—the Railroad unlawfully discriminated against other producers and shippers, and thus was able to advance toward complete control. The extent of its progress in that direction is indicated by the following facts: By September, 1896, the Coal & Iron Company had acquired about 169,000 acres of land in the Schuylkill region, more than 98,000 containing coal, and also controlled the capital stock of six other corporations that owned more than 11,000 acres in the same region, 9,000 containing coal. These lands, it is said, contain more than half the coal in the Schuylkill region, and nearly half the whole deposit. On these lands there were 65 collieries, most of which were operated by the Coal & Iron Company; the production in 1896 being more than 7,000,000 tons. As the Coal & Iron Company also bought coal at the mines from other producers, its total shipments in 1896 over the Railroad were more than 8,000,000 tons. This was about 80 per cent. of all the anthracite carried by the Railroad.

These transactions by the two companies are attacked as outside the normal course of business development, and as having both the object and the effect of giving the Railroad control of production in the Schuylkill region, and control of carriage and of sale, to and in markets beyond the state. Therefore the Railroad's control of the Coal & Iron Company by stock ownership is charged to have been an unlawful combination and monopoly.

But the government expressly declares that it does not attack the Coal & Iron Company, in and of itself, as an unlawful combination or monopoly.

2. Leasing of the Schuylkill and the Susquehanna Canals by the Reading Railroad:

The Schuylkill Navigation Company (not a defendant) owns a canal and slack-water navigation along the Schuylkill river from Port Carbon to Philadelphia, and since before 1870 this canal has been a water route from the coal field to tidewater. In 1869 it carried more than 1,000,000 tons of freight, most of it anthracite; and it was then, and for many years had been, competing actively with the old Reading Railroad in the carriage of coal from the mines to Philadelphia and to intermediate points. In July, 1870, in order to suppress such competition and to monopolize the carriage of anthracite from the Schuylkill region, the Railroad leased the canal for 999 years at an annual rental of $655,000. Afterwards it acquired nearly all the Navigation Company's capital stock and debt, $4,000,000

226 F.—16

and $8,500,000, respectively. Being thus in control, it diverted traffic from the canal to its own road, so that in 1880 the canal's tonnage was less than 700,000 tons, in 1890 it was less than 150,000 tons, and since that year it has diminished still further. In 1888 the rental was reduced to a nominal sum; before that time the Railroad's loss in operating the canal had been $150,000 a year, this being the price of suppressing competition. The Railroad's lease and other interest continued until September, 1896, when all its property was sold at receivers' sale. The Railroad's control of the Schuylkill Canal is charged to have restrained and monopolized trade unlawfully because the canal's competition was thus suppressed.

We need not refer to the Susquehanna Canal—which runs from Columbia, Pa., to Chesapeake Bay—because the government seems to lay no weight on the subject.

3. Temporary leasing of the Lehigh Valley and the Central Railroads by the Reading Railroad:

The bill goes on to charge that the old Reading Railroad, being thus dominant in producing and transporting coal from the Schuylkill region, undertook to enter the Lehigh and Wyoming regions also. Accordingly in 1892 it leased for 999 years the lines of the Lehigh Valley Railroad Company, which entered all the regions and extended to New York Harbor and westwardly to Buffalo. It did not act directly in leasing the Central Railroad, but used the agency of the Port Reading Railroad Company, whose entire capital stock it owned. Accordingly the Port Reading Company leased for 999 years the lines of the Central Railroad, which entered the Wyoming region and touched the Lehigh and the Schuylkill regions, and had three New York terminals. At the same time the Coal & Iron Company—whose stock also was owned entirely by the Reading Railroad—contracted to purchase at the mines the whole output of the Lehigh Valley Coal Company, a large owner and producer in all three regions, whose capital stock was owned by the Lehigh Valley Railroad Company. And the Coal & Iron Company made a similar contract with the Wilkes-Barre Coal Company, a large owner and producer in the Wyoming region, whose capital stock was nearly all owned by the Central Railroad. By these arrangements it is charged that the Reading Railroad would have controlled about 75 per cent. of the total deposit of anthracite, and the transportation of about 50 per cent. of the annual output.

Except in their bearing upon the question of the old Reading Railroad's purpose and object, these leases and contracts are no longer important; the agreements with the Central Railroad and with the Wilkes-Barre Coal Company were set aside by the New Jersey Court of Chancery, and the Lehigh Valley contracts were thereupon rescinded.

*Charges in 1896.*

In 1893 the old Reading Railroad and the Coal & Iron Company went for the third time into the hands of receivers, and on September 23, 1896, all the properties of both companies were sold at judicial sale in accordance with a plan of reorganization of which J. P. Morgan

& Co. were the managers. In November, the Reading *Railway* was organized and took title to the railroad properties (except the equipment) formerly belonging to the old Reading *Railroad,* paying for the same by delivering certificates of stock representing its whole capital of $20,000,000, and by executing a purchase-money bond and mortgage, also for $20,000,000. The Railway took possession on December 1, and since then has continuously operated these roads.

In November, the purchasers at the sale reconveyed to the Coal & Iron Company its former property, including lands, mines, and shares of other companies. In consideration whereof it joined the holding Company as co-obligor in a general mortgage for $135,000,000. On December 1 it took possession of the reconveyed property, and has since been engaged in mining, selling, and shipping coal.

Among the securities acquired from the old Reading *Railroad* at . the receivers' sale was the whole capital stock of the Reading Company, a Pennsylvania corporation that had been created under another name in 1871, with power inter alia to buy and sell the shares and bonds of other corporations. This company had maintained its corporate existence, but had done little active business. But, as it antedated the Pennsylvania Constitution of 1874—which forbade a common carrier to mine coal for transportation over its line—it was believed to be a suitable agency to effect the practical and substantial combination of the Coal & Iron Co. and the Reading Railway in spite of the constitutional provision. Accordingly, its capital stock was increased to $140,000,000 and its name was changed to the Reading Company—called the Holding Company in this opinion.

On December 23 the Holding Company took title to the whole capital stock of the Railway Company and of the Coal & Iron Company, $20,000,000 and $8,000,000, respectively; to the purchase-money mortgage debt of the Railway Company, $20,000,000 in a single bond; and to all other property sold at the judicial sale that had not already been conveyed to the Reading Railway, or to the Coal & Iron Company. The Holding Company thus acquired the equipment (railroad and marine) of the old Reading Railroad; the claim of that Railroad against the Coal & Iron Company for advances and freight, amounting to more than $68,000,000; and the capital stock and debt of the Schuylkill Navigation Company. In consideration of this transfer, the Holding Company delivered certificates for its $140,000,000 of capital stock (except $50,000 thereof), and on January 5, 1897, gave a general mortgage, with the Coal & Iron Company as joint obligor, which covered substantially all the property of both companies, to secure $135,-000,000 of bonds. Of these about $50,000,000 were presently delivered, and the remainder was reserved. The stock and bonds thus delivered by the Holding Company were thereupon distributed among the persons entitled thereto under the plan of reorganization. Thus the Holding Company became the owner of all the equipment formerly owned and used by the old Reading Railroad.

The same person became president of the Holding Company, of the Reading Railway, and of the Coal & Iron Company, and the same person became treasurer of each. The directors of the Holding Com-

pany furnished a majority in the boards of the Reading Railway and of the Coal & Iron Company, and as a rule the majority in each of these two boards was composed of, the same individuals.

Of the bonds secured by the general mortgage of $135,000,000—which binds both the Holding Company and the Coal & Iron Company—nearly $51,000,000 were reserved (and are being used) to take care of bonds of the old *Railroad* that are secured by mortgage on property now owned by the Reading *Railway;* $14,000,000 were reserved to take care of bonds of the Coal & Iron Company; and $20,-000,000 were reserved and have been used for the benefit of the Reading Railway's roads.

The general mortgage referred to makes both obligors liable for the interest on the outstanding bonds of, the old Railroad, and on the similar bonds of the Coal & Iron Company. The Reading Railway cannot raise capital for new construction or improvements by a public sale of the bonds that were reserved for that purpose by a certain prior mortgage dated November 18, 1896, but is obliged to deliver such bonds to the Holding Company with an equal amount of its capital stock. Thereupon the Holding Company is to deposit the securities under the general mortgage of January 5, 1897 and issue an equal amount of its own bonds, paying over the proceeds of these to the Railway.

Before the Holding Company can declare or pay a dividend, it must deliver to the trustee under the general mortgage a statement showing the output of, anthracite during the year preceding from the lands owned by the Coal & 'Iron Company, and must pay to the trustee 5 cents per ton on such output, if the dividend equal or exceed such sum, or such smaller amount as may equal the dividend so declared. The Holding Company still owns the whole capital stock of the Reading Railway and of the Coal & Iron Company, and has always directed the votes thereon. The three Reading Companies have continued to have in common the same president, treasurer, and certain other officers. The general offices of each company are in the same building, and their annual reports are published in the same pamphlet. From 1906 to 1911 the Reading Railway paid an annual dividend of 30 per cent. In 1911 its capital stock was more than doubled and its rate of dividend reduced to 15 per cent. These dividends, with other payments made by it, constitute nearly 80 per cent. of the Holding Company's income. The Coal & Iron Company has never paid a dividend. Since 1898 the new equipment of the Reading Railway has cost $30,000,000, and of, this amount the Holding Company has contributed $24,000,000.

Thus it is alleged that the Holding Company, the Reading Railway, and the Coal & Iron Company, are one and the same association of persons, engaged in mining, selling, and transporting, anthracite coal under the direction of the individuals named as defendants. And the Holding Company, by acquiring the capital stock of the Reading Railway and of the Coal & Iron Company, has become the successor of the old Reading Railroad in the policy, referred to above, of monopolizing production and transportation in the Schuylkill region.

Therefore the Holding Company's stock control of the Reading Railway and of the Coal & Iron Company is an unlawful combination and monopoly, in violation of the act of 1890. And a similar charge is made against the Holding Company's stock control of the Reading Railway and of the Schuylkill Navigation Company. (A violation of the commodities clause is also charged, but this will be considered separately.)

*Charges from 1896 to 1901.*

1. Advances to the Coal & Iron Company:

As already stated, the Holding Company became the owner in 1896 of the old Railroad's claim against the Coal & Iron Company for advances and for unpaid freight, amounting to about $68,000,000. Thereafter from time to time the Holding Company advanced $12,000,000 more to the Coal & Iron Company for like purposes, this debt being carried on the books of both companies merely as an open account. Interest thereon is not treated as a fixed charge of the Coal & Iron Company; none was paid prior to 1900, and since then never at a higher rate than 2 per cent.; the rate in 1911 being one-half of 1 per cent. Further, although the Coal & Iron Company is jointly liable with the Holding Company for the interest on the bonds outstanding—now about $99,000,000—secured by the general mortgage of January, 1897, the Holding Company has always paid the whole of such interest, and has made no charge against the Coal & Iron Company on account thereof.

It is therefore alleged that, as the Holding Company and the Reading Railway are united in ownership and management, the advances and accommodations extended by the Holding Company to the Coal & Iron Company are to be attributed to the Reading Railway itself, and are unlawful discriminations against other shippers; the reason being that such advances and accommodations increase the power of the Coal & Iron Company over these competitors, and thus promote and secure the monopoly that the Holding Company has acquired (through the agency of the Coal & Iron Company) in the ownership, production, and sale of anthracite coal.

2. Wilmington & Northern Railroad:

Before 1898 the Wilmington & Northern Railroad Company was operating a line from Wilmington, at the head of Delaware Bay, to Reading, and especially was carrying anthracite coal in competition with the Reading Railway, whose line ran from Reading to Philadelphia, and thence to Chester, where it connected with the Baltimore & Ohio Railroad and thus reached Wilmington. It is charged that these two roads were then, and are now, "potentially" competitive routes of transportation from the anthracite field to tidewater at the head of Delaware Bay.

In 1898 the Holding Company acquired a majority of the Wilmington & Northern's capital stock, and early in 1900 the Reading Railway leased the road and has been operating it ever since. Thus the Holding Company enlarged and made more secure its grasp upon the ownership, production, sale, and transportation of anthracite coal in and from the Schuylkill region. The common control by the

Holding Company of these two carriers, in and of itself, is said to be a violation of the act of 1890.

(The transactions of the Temple Iron Company are then referred to, but as these are sufficiently described in the former case, reported in. (C. C.) 183 Fed. 427, and in 226 U. S. 324, 33 Sup. Ct. 90, 57 L. Ed. 243, and were finally disposed of by the Supreme Court, they need no further attention now. They can only be relevant so far as they may bear upon the intention and the object of other acts complained of in the present action.)

3. Purchases from other persons:

In furtherance of the Holding Company's monopoly, it is also charged that the Coal & Iron Company, being itself the producer of more than 80 per cent. of all the anthracite carried by the Reading Railway, nevertheless has violated the act of 1890 by buying coal from other producers. This it has done since before 1901, buying from 800,000 to 1,400,000 tons annually, and thereby acquiring control of about 85 per cent. of all the anthracite carried by the Reading Railway.

### Lehigh Navigation Company.

Passing now to another subject, the bill takes up the charges against the Lehigh Navigation Company and some of the other defendants:

1. Transactions between the Lehigh Navigation Company and the Central Railroad:

As already stated, the Lehigh & Susquehanna Railroad—which extends from the Wyoming region to Phillipsburg on the Delaware river—was built by the Lehigh Navigation Company, and was operated by that company from 1868 until 1871. At Phillipsburg it connects with the Central Railroad, extending to Jersey City, and also with a line to Hoboken now operated by the Delaware, Lackawanna & Western Railroad. It also connects at Phillipsburg with a line now operated by the Pennsylvania Railroad; with the Morris Canal, extending to New York Harbor; and with the Delaware Division Canal, extending to Bristol, on the Delaware river near Philadelphia.

On March 31, 1871, the Lehigh Navigation Company leased its railroad for a long period to the Central Railroad. It was to receive one-third of the leased railroad's gross receipts, and agreed to ship over that road and other roads operated by the Central all the coal produced by the mines it owned or controlled, or might own or control—except one-fourth of the output of its mines in the Wyoming region, and except also the coal shipped over its canal, and certain other coal not now material. It also agreed that the freight rates upon its canal between points common to the leased railroad and to the canal should as nearly as possible be the same as the rates between the same points on the railroad.

In May, 1883, while the old Reading Railroad was still holding the lines of the Central Railroad under lease, the Reading took the Central's place under the agreement of March, 1871, but modified it as follows: The Reading agreed to develop the property of the Wilkes-Barre Coal Company—whose stock was controlled by the Central—

and to ship the product over the Lehigh & Susquehanna Railroad, and agreed, further, that if, in any year, the one-third of the gross receipts that had been reserved as rental by the lease of 1871 should fall short of $1,114,400, the Reading would make up the deficiency, while, on the other hand, if such one-third should exceed $2,043,000 (with certain additions) the Navigation Company would relinquish any claim to the excess. As already stated, however, the lease of the Central Railroad to the old Reading Railroad was set aside, and in June, 1887, the Central was reinstated, and thereupon was confirmed by the Navigation Company as the lessee of the Lehigh & Susquehanna Railroad under the old agreement of 1871, modified by the changes made in 1883.

The bill charges that the practice of the parties to the agreement of March, 1871, has always so construed it that the Lehigh Navigation Company is absolutely bound to ship three-fourths of its output over the lines of the Lehigh & Susquehanna Railroad and of the Central Railroad, except the coal shipped over its canal, and that it cannot escape the obligation by selling its output before shipment. As very little of the Navigation Company's coal is shipped over its canal —only 6 per cent. in 1912—the quantity exempt from the agreement of 1871 is comparatively small.

Since January, 1874, the Central Railroad has owned a majority— now nine-tenths of about $9,200,000—of the Wilkes-Barre Coal Company's capital stock. The two companies have the same president, secretary, and treasurer, and of the Coal Company's seven directors, five until recently—and three now—were also directors of the Railroad. The output of the Coal Company is carried from the mines by the Central Railroad; most of it goes to points outside of Pennsylvania, and, with the output of the Lehigh Navigation Company, constitutes more than 80 per cent. of the Central's anthracite tonnage. The funded debt of the Coal Company, nearly $17,000,000, is guaranteed by the Central Railroad, principal and interest, and the Railroad has advanced large sums to the Coal Company, upon which interest has sometimes not been exacted.

At all times, therefore, during the existence of the arrangement of March, 1871, the Central Railroad has controlled the stock of the Wilkes-Barre Coal Company, which is a large owner, miner, and seller of anthracite coal. During the same period (except for a few years) the Lehigh Navigation Company also was a large owner, miner, and seller of coal, and therefore was and still is a potential competitor of the Coal Company. When, therefore the Lehigh Navigation Company's railroad was turned over to the Central Railroad with an agreement to divide earnings, and to ship nearly all the coal output controlled by each company over the railroad system formed by their joint lines, the Navigation Company and the Central Railroad united in a close alliance and community of interest. As evidence thereof, the Navigation Company's report for 1887 is referred to, which states that the contract has had a considerable effect in unifying the interests of the two companies, so that each is likely to benefit by the business of the other.

The government admits that (under proper conditions) the operation of the Lehigh & Susquehanna Railroad by the Central Railroad—which is the owner, not of a competing, but of a connecting, line—might be lawful and in the public interest, but contends that the agreement of March, 1871, violates the act of 1890 for the following reasons:

(1) It suppresses competition in the production and sale of coal between the Lehigh Navigation Company and the Wilkes-Barre Coal Company, because the Central Railroad controls the Coal Company and has formed an alliance with the Navigation Company.

(2) It unreasonably restricts the Navigation Company in the choice of markets and in carrying on its business, because it requires the Navigation Company to ship three-fourths of its output over the railroads operated by the Central Railroad, and because the agreement prevents competition between the Central Railroad and other carriers in the same locality for the transportation of such output.

(3) It suppresses competition between the canal and the railroad of the Navigation Company, because it requires rates between points common to both to be arranged by mutual agreement between the navigation Company and the Central Railroad. ·

(Then follow certain averments about the application of the commodities clause.)

2. Control of the Hudson River Railway, and of the New England Railroad:

In 1885 the Lehigh Navigation Company and the Central Railroad jointly bought a majority of the capital stock of the Hudson River Railway, and thereafter jointly advanced money for its improvement and extension. Its present outstanding capital stock is $1,340,000; of this the Navigation Company owns $507,900, and the Central Railroad Company $163,300, together a majority; and they jointly guarantee the principal and interest of about $1,000,000 of its funded debt —$3,229,000. On the board of directors of the Hudson River Railway are the president, the vice president, and a director of the Central Railroad and the vice president of the Navigation Company; and the president of the Hudson River Railway, who is also one of its directors, is a director of the Navigation Company.

In 1904 the Navigation Company acquired a majority, and it now owns substantially the whole, of the capital stock of the New England Railroad. The two corporations use the same general office, and have in common the same president, vice president, secretary, and a majority of the board of directors. The Navigation Company controls the operation of the road, and supplies the capital needed for its business. In reality, therefore, the Navigation Company and the New England Railroad are one and the same association of persons, engaged in mining, selling, and transporting anthracite coal. The New England Railroad carries large quantities of coal that have been mined and are still owned by the Navigation Company.

In 1904, and at all times since, the Hudson River Railway and the New England Railroad, with the connections already described, constituted two potentially competitive and substantially parallel routes

of transportation between the anthracite field and points in New York and New England on the systems of the New York Central and the New York, New Haven & Hartford, and over these routes anthracite coal and other freight have been moving in continuous carriage. Then and now there was but one other direct all-rail route between the anthracite field and central and southern New England. It is charged, therefore, that the common control of these two routes through the stock ownership of the allied Lehigh Navigation Company and the Central Railroad prevents competition, and restrains and monopolizes trade, in violation of the act of 1890.

(And the Navigation Company and the New England Railroad are also charged with violating the commodities clause.)

The final combination is charged to be as follows:

### Transactions in 1901 between the Holding Company, the Central Railroad, and the Lehigh Navigation Company.

Since December, 1896, as already stated, the Holding Company has owned all, or substantially all, the capital stock of the Reading Railway and of the Coal & Iron Company, and nearly all the capital stock of the Wilmington & Northern Railroad and of the Schuylkill Navigation Company, and it controls the management of these four companies. Since January, 1874, the Central Railroad has owned a majority (now nine-tenths) of the capital stock of the Wilkes-Barre Coal Company, and since before 1901 has had a close alliance and common interest with the Navigation Company. Since 1885 they have jointly controlled the Hudson River Railway through stock ownership, and since 1904 the Navigation Company's stock ownership has controlled the New England Railroad. Since long before 1904 the Navigation Company has operated canals from Mauch Chunk to the Delaware river near Philadelphia.

The Coal & Iron Company is the largest owner, producer, and seller of anthracite coal. Its lands in the Schuylkill region contain many million tons, variously estimated at from 40 to 50 per cent. of the unmined deposit. In 1912, which was a typical year, it produced and sent to market 11,000,000 tons, about 16 per cent. of the total output. The Wilkes-Barre Coal Company is also a large owner, producer, and seller of coal. Its lands are mainly in the Wyoming region, and have been estimated to contain about 10 per cent. of the unmined deposit. In 1912 it produced nearly 5,000,000 tons, and bought from other producers for resale about 700,000 tons, marketing about 7½ per cent. of the total output. The Lehigh Navigation Company is another large owner, producer, and seller of coal. Its lands are in the Lehigh region, and have been estimated to contain about 10 per cent. of the unmined deposit. In 1912 it produced nearly 4,000,000 tons, or 5 per cent. of the total output. Since long prior to 1901 a large part of the coal either mined or bought by the three companies just named has been shipped to the principal Eastern and New England markets, to be there sold or delivered under contracts previously made. Except for the violations of law complained of, they would

have been, and would now be, active competitors in the mining, purchasing, shipping, and selling.

Turning from the coal companies to the railroads and canals, the bill goes on to aver:

The Reading Railway has always been distinctively a carrier of anthracite. In 1912 it carried from the mines nearly 13,000,000 tons, more than 20 per cent. of the total output; and in recent years anthracite has formed nearly 60 per cent. of the freight traffic originating on its lines, and has formed one-third of its total freight traffic, whether originating on or off its lines. The carriage of coal has furnished from 33⅓ to 40 per cent. of its total revenue from freight. The Central Railroad also has been for many years predominantly a carrier of anthracite. In 1912 it carried more than 8,000,000 tons, or 33 per cent. of the total shipments from the mines, and in recent years coal has furnished more than 60 per cent. of the freight traffic originating on its lines, and more than 30 per cent. of its total freight traffic from all sources, yielding from 43 to 50 per cent. of its total revenue from freight. The rail and water lines (not the canals), operated since before 1901 by the Reading Railway and by the Central Railroad, have been, and are now, potentially competitive routes of transportation between the anthracite field and points on the Delaware river, Baltimore, Washington, points on the Hudson river, points between Albany and Boston on the New York Central, and points in central and northern New England on the Boston & Maine.

Since before 1901 the Wilmington & Northern Railroad has also been a potential competitor to some extent of the Reading Railway, especially in the transportation of anthracite.

The Hudson River Railway and the New England Railroad, with their connections, are also two potentially competitive and substantially parallel routes of transportation between the anthracite fields and points in New York and New England on the systems of the New York Central and of the New York, New Haven & Hartford; and each of these routes is a potential competitor of the rail and water routes to New England, referred to above as operated by the Reading Railway and the Central Railroad, respectively.

Since before 1901 the canals of the Lehigh Navigation Company and the Schuylkill Navigation Company have been and now are potential competitors of the railroads for transportation between the anthracite field and the Delaware river near Philadelphia; they are the only all-water routes from these regions to tidewater.

This being the situation in January, 1901, the bill charges that the Holding Company—which already dominated the production and transportation of anthracite in and from the Schuylkill region—undertook to extend the power of the Reading System into the Wyoming and Lehigh regions. With this object it bought a majority—145,000 shares —of the Central Railroad's capital stock for $160 per share, borrowing about $23,000,000 of the purchase money by pledging the shares. By this transaction the Holding Company now controls about 63 per cent. of the unmined deposit of coal. Afterwards the Central Railroad acquired and now owns over $4,000,000 of bonds under the gen-

eral mortgage of the Holding Company and of the Coal & Iron Company. The Holding Company still owns a majority of the Central Railroad's stock, directs the votes thereon, and receives the dividends. Soon after the purchase, the president of the three Reading Companies became the president of the Central Railroad and of the Wilkes-Barre Coal Company, and has continued to fill those offices; and the directorates of these five companies and of the Lehigh Navigation Company have been, and are, interlocking in varying proportions.

The transactions thus outlined were not the results of the normal business development of the Holding Company, but were entered upon in order unduly to restrict competition in the producing, shipping, selling, and transportation of coal. This purpose was carried out:

(1) By uniting under a single control the Coal & Iron Company and the Wilkes-Barre Coal Company, who were competitive owners, producers, shippers, and sellers, and together owned or controlled more than 50 per cent. of the unmined deposit, and marketed about 25 per cent. of the annual supply.

(2) By uniting under a single control the Reading Railway and the Central Railroad, who were competitive interstate carriers, and together transported about one-third of all the anthracite moving from the mines.

(3) By making the Holding Company—by virtue of its majority ownership in the stock of the Central Railroad—a party to the alliance and community of interest between the Central Railroad and the Lehigh Navigation Company; the effect being to do three things:

(a) To combine the coal business of the Coal & Iron Company, of the Wilkes-Barre Coal Company, and of the Lehigh Navigation Company, who were competitive owners, producers, buyers, shippers, and sellers, and together owned or controlled more than 63 per cent. of the unmined deposit, and marketed about 30 per cent. of the annual supply.

(b) To combine the Reading Railway and two of its competitors, the Central Railroad and the Wilmington & Northern, adding to the combination the Hudson River Railway Company, which operates part of a through route to points in New England, this route being potentially competitive with the rail and water routes that are operated to points in New England by the Reading Railway and by the Central Railroad, and adding the New England Railroad in 1904 (which operates another potentially competitive line) by the agency of the Lehigh Navigation Company's ownership of the New England's stock.

(c) To combine the canal of the Schuylkill Navigation Company, and the canals of the Lehigh Navigation Company, these being the only all-water routes now operated from the anthracite field to tidewater.

According to some estimates of geologists and engineers, the coal lands owned or controlled by the companies thus combined are likely to outlast by many years the lands of any competitor. In time, therefore, these companies will probably own or control every remaining ton of commercially available anthracite known to exist, and the monopoly that will then exist cannot possibly be broken. In a word,

therefore, the ownership by the Holding Company of a controlling interest in the capital stock of the Central Railroad is charged to be an unlawful combination and monopoly, in violation of the act of 1890.

### Reasons for Joining Several Causes of Action.

The combination and monopoly resulting from the control exercised by the Holding Company over the allied Central Railroad and the Lehigh Navigation Company, and the contributory combinations and monopolies resulting from the control by the Holding Company, by the Central Railroad, and by the Lehigh Navigation Company, over other corporations, are so interrelated that to ask relief in one suit prevents a multiplicity of actions and a confusion of parties and promotes the convenient administration of justice.

And finally it is charged that the asserted violations of the commodities clause are also means to effect the asserted violations of the act of 1890.

### Relief Asked for.

The court is prayed to decree:

1. That the Holding Company, the Coal & Iron Company, the Reading Railway, and the individual defendants, form an unlawful combination and a conspiracy in restraint of interstate and foreign trade, and a monopoly of part of such trade, and to enjoin them from carrying out or maintaining such, or any similar, combination and monopoly.

2. That the Holding Company's control of the Coal & Iron Company and of the Reading Railway through stock ownership is a like combination and monopoly, and to require the Holding Company to dispose of its stock in these two companies to persons not its own stockholders or agents, or otherwise under its control or influence, and, pending such disposition, to enjoin the Holding Company from voting or receiving dividends thereon.

3. That the Coal & Iron Company's purchases from other producers assist, and have assisted, such combination and monopoly, and to enjoin such purchases in the future.

4. That the Holding Company's control of the Schuylkill Navigation Company through stock ownership is a like combination and monopoly, and to require a like disposition of such stock, and, pending such disposition, to enjoin the Holding Company from voting or receiving dividends thereon.

5. That a similar decree be made in reference to the Holding Company's control of the Wilmington & Northern Railroad, through stock ownership, and through the lease of that railroad by the Reading Railway, and to direct the lease to be canceled.

6. That the agreement of 1871, with its later modifications, between the Central Railroad and the Lehigh Navigation Company, for the lease of the Lehigh & Susquehanna Railroad, is a like combination and monopoly, and to direct it to be canceled, and to enjoin the parties from carrying it out, unless they modify it further: (a) By making the rental a fixed sum, instead of a proportion of the Lehigh &

Susquehanna's receipts; (b) by striking out the provision that the Navigation Company must ship most of its output over the leased Railroad and over the other lines operated by the Central Railroad; and (c) by striking out the provision in reference to rates between common points on the canal and railroad.

7. That the control of the Hudson River Railway and of the New England Railroad by the Lehigh Navigation Company and the Central Railroad through stock ownership therein is a like combination and monopoly, and to require a like disposition of these stocks, and meanwhile to enjoin the Navigation Company and the Central Railroad from voting or receiving dividends thereon.

8. That the Holding Company's control of the Central Railroad's capital stock is a like combination and monopoly, and to require a like disposition of such stock, and meanwhile to enjoin the Holding Company from voting or receiving dividends thereon.

9. That the Holding Company, in and of itself, is a like combination and monopoly.

(The prayers based upon the commodities clause will be considered separately.)

### Answers of Defendants.

The foregoing is a fairly complete summary of the bill. The answers of the defendants may be dealt with more briefly. With a few exceptions, the facts set forth in the bill—meaning thereby the acts done, and the agreements made—are admitted; but the inferences sought to be drawn therefrom by the government are denied generally and specifically, and the position is taken that these acts and agreements were not, and are not, in violation of law, and have not produced the unlawful and injurious effects charged. Some of the new matters set up are as follows:

The answer of the *Holding Company* avers that since it acquired the capital stock of the Coal & Iron Company in 1896 its loans to that company have been temporary and commercial in character—such loans as large business enterprises commonly obtain during the months of production that precede the sale of their product—and that these loans have been usually repaid with 4 per cent. interest, within a few months after they are made. The answer also avers that the $12,000,000 advanced to the Coal & Iron Company was to pay prior liens on its property, and was obtained by selling part of the bonds specially retained for this and other purposes in the general mortgage of January, 1897. With reference to the reorganization in 1896, the answer denies that either then or at any other time the Holding Company became an instrument to accomplish any unlawful or improper purpose, or to accomplish a lawful purpose in an unlawful or improper way—averring, on the contrary, that the plan of reorganization was prepared and carried out in order to save large investments of the public, which had been encouraged by the laws of the land and had been made in compliance therewith, for the purpose of promoting praiseworthy and beneficial enterprises; that the plan was intended to continue these enterprises and advance their growth and development, and was prepared and carried out in reliance on

the rule of law that to discover a legal way to reach a lawful result is not an illegal evasion. With reference to the purchase of the Central Railroad's shares, the answer avers that the purchase was in the normal course of lawful business development, because the Central Railroad's system and the Reading Railway's system had been for 40 years connecting lines, supplementing each other in forming through routes for the commerce of the country, each line being a necessary outlet for much of the other's traffic, and avers, further, that these through routes should be maintained, because, instead of restraining trade, they are of vast importance in promoting it.

The answer of the *Coal & Iron Company*—while admitting the control for many years (through stock ownership and by lease) of the Tremont and other coal companies, which owned about 9,000 acres of coal lands in the Schuylkill region—goes on to aver that all these shares and all its own coal lands, purchased or otherwise acquired, were obtained in the normal course of its lawful corporate business, and in the exercise of the lawful powers granted by its charter, and avers, further, that these lands were acquired with the purpose of mining them as soon as practicable, and thus of securing the means of competing continuously in producing and selling the very commodity that it was chartered to mine and sell. With reference to the purchases of coal from other producers, it avers that such purchases were in the usual course of business, have always been made from the beginning of its active operations, and in fact were made by the receivers appointed by the United States court during the three receiverships that extended (with an interval of five years) from May, 1880, to December, 1896, and avers further, that such purchases were made in the lawful exercise of lawful powers and in the usual course of business, and are neither influenced nor constrained but are made only because both parties find them advantageous, economical, and otherwise profitable. With reference to the advances made by the old Reading Railroad, it declares the transactions to have been natural and lawful; the object being to aid the Coal & Iron Company to acquire coal lands, the shares of other coal mining companies, and shipping and marketing facilities, so that the lands might be developed and the production and sale of anthracite might be increased. The amount of these advances is as follows:

1. A mortgage bond, dated July 1, 1874........................$30,000,000 00
2. A mortgage bond, dated December 28, 1876.................. 10,000,000 00
3. Cash advances........................................... 24,879,336 16
4. Current business account, about......................... 4,300,000 00

By far the largest part of this indebtedness accrued long prior to 1890, and most of it prior to 1887; these advances and the old Railroad's guaranty both being authorized by law.

The answer of the *Reading Railway* avers that it has always been a carrier not only of anthracite but also of bituminous coal and of general merchandise. In 1912, while it carried 11,225,000 tons of anthracite, it carried nearly 15,000,000 tons of bituminous coal, and nearly 23,000,000 tons of general merchandise. It denies that the old

Reading Railroad violated any law by acquiring the capital stock of the Coal & Iron Company in 1871, or by buying or guaranteeing its bonds, since the Coal & Iron Company's charter expressly made it lawful "for any railroad or mining company existing under the laws of this state to subscribe for or purchase the stock, or to purchase or guarantee the bonds, of the company hereby incorporated." With reference to the canal of the Schuylkill Navigation Company, it denies that the contract of the old Railroad Company—which was duly authorized by a Pennsylvania statute of April 14, 1870 (P. L. 75)—or the old Railroad's acquisition of a large part of the Navigation Company's capital stock, was intended to suppress competition in the transportation of coal by the canal, or in any way tended to monopoly of that sort, denying the diversion of such traffic to the Railroad. On the contrary, it avers that the channel of the canal does not reach the mines—the points of origin of the coal—and cannot make the deliveries required by the markets at the points of destination, that purchasers of coal will not tolerate the slow transportation by canal when transportation by rail can be obtained, and that the services necessary in the carriage or delivery of anthracite cannot be economically performed by the canal. It denies, therefore, that the canal is, or could be, an active competitor of the Railway in carrying coal from the mines to tidewater at Philadelphia or to intermediate points.

The *Central Railroad's* answer details the steps that led up to the contract of March, 1871, by which the Lehigh & Susquehanna Railroad was leased from the Lehigh Navigation Company. At first—in 1847—the Central was a short local railroad in New Jersey, but afterwards grew (always under legislative authority) into a through route across New Jersey from Easton, on the Delaware river, to New York Harbor. Its connections were of great importance. At Easton it connected with the Lehigh Valley Railroad; opposite Easton, with the Lehigh & Susquehanna Railroad; at Hampton, a few miles further east, with the Delaware, Lackawanna & Western Railroad; and it also had a through connection to the west by the way of Easton, Reading, and Harrisburg, known as the "Allentown route," over the Lehigh Valley, the old Reading Railroad, and the Pennsylvania. From all these sources it received much business, and in order to take care of this business it was obliged to spend a great deal of money in construction and in terminal and other facilities. For example, at one time it was compelled to have a third rail in order to accommodate the Lackawanna cars, which were then of broad gauge. In 1871 the loss of a large part of this business was threatened. The Lehigh Valley had acquired or was acquiring a line of its own to New York Harbor. So was the Lackawanna; while the Lehigh Navigation Company's railroad was apparently on the point of making a traffic arrangement with the Lackawanna. The Allentown route had been disrupted, and the Pennsylvania's traffic had been lost. In this situation—having lost the Pennsylvania's traffic, much of the Lehigh Valley's traffic, with a prospect of losing the rest, and all the passenger and general freight traffic of the Lackawanna, with a prospect of losing its coal also—the Central was compelled to decide whether it would abandon competition

with its rivals and resume its local character, or would become an active competitor. Choosing the latter course, it entered the anthracite field by making the lease in question. The arrangement benefited the public by creating and maintaining a through route; it benefited the Central's stockholders by giving them a permanent Pennsylvania connection; and it benefited the Lehigh Navigation Company's stockholders by giving them a tidewater outlet for their coal. The answer denies, further, that either now or recently the Central has operated vessels to Long Island Sound or to New England (the Wilkes-Barre Coal Company now owning and operating the fleet), and denies also (as do several other answers also) that the carriage of anthracite by railroad, at the rates now and for a long time past in force, has been or is enormously profitable.

The *Wilkes-Barre Coal Company* admits the purchase of coal from other producers, but avers the lawfulness and customary character of the transaction, declaring that it neither influences nor constrains such contracts, which are entered into only because the parties find them mutually advantageous, economical, and otherwise profitable. It also avers its active competition at all times with other coal producing companies. In August, 1912, the Coal Company bought, and shortly afterwards paid for, the tugs and barges of the Central Railroad, and since that time has operated them between New York Harbor and New England.

The *Wilmington & Northern Railroad* avers that anthracite is, and has been, a comparatively small part of its freight; its principal freight being, as it has always been, iron and steel and the raw materials entering into their manufacture, and, next to these, agricultural and dairy products. It avers, also, that its line is and has always been connecting and supplementary with the Reading Railway, having been built for this very purpose—the two lines forming a natural, direct, through route from points on one to points on the other—and that to maintain such a route aids commerce, instead of restraining it.

The *Lehigh Navigation Company's* answer sets forth, inter alia, as follows:

Certain persons named in a very early Pennsylvania statute were interested in coal mines near Mauch.Chunk on the Lehigh river, and in the improvement of the river in order to market their coal. By a canal and slack-water navigation, afterwards constructed by them or by their successors, coal was carried down the river to Easton, where it met the Delaware Division Canal, which had been built by the state of Pennsylvania from Easton to tidewater on the Delaware river. Thus coal could be brought from the Lehigh region to Philadelphia and its neighborhood. Later, in 1837, the Navigation Company was authorized to build a railroad from its canal over the mountain into the Wyoming region. In 1862, after part of the canal had been swept away by floods, the Legislature permitted this gap to be replaced by a railroad. In 1864 the Navigation Company was empowered to extend the railroad to Easton, and bridge the Delaware river to Phillipsburg. The Navigation Company also owned a large acreage in the Wyoming region, and controlled (through stock ownership in the Honey Brook

Coal Company) other lands in the Lehigh region. The motive and purpose, therefore, for the construction of the canal and the railroad, were to afford a market for the coal mined in those regions, and these public highways would never have been built, if much of the coal had not been owned by their builders. The Navigation Company is the lessee of the Delaware Division Canal under authority from the state of Pennsylvania, and avers that over neither canal has it exercised any other than a lawful power. With reference to the agreement of March, 1871, with the Central Railroad, it avers that the main purpose of the modification made in 1883 was to prevent the old Reading Railroad (after it had acquired control of the Navigation Company's railroad) from diverting the Wyoming coal and other traffic in favor of the Reading's own lines, and it denies any practice by the parties modifying the terms of the agreement. It admits that, out of 200,000 shares, it owns 500 shares of the Wilkes-Barre Coal Company's stock, and explains that these were bought to protect a debt, for which they had been pledged; and it denies any concert of action with the Central Railroad in the management of the Wilkes-Barre Coal Company in order to suppress competition.

With reference to the Hudson River Railway, the Navigation Company denies having control of its policy or management, either alone or jointly with the Central Railroad, and either directly or indirectly.

With reference to the New England Railroad, it details the steps in the organization of that company. Originally, two small roads existed that the Navigation Company had acquired as feeders from certain slate quarries to its own railroad, the Lehigh & Susquehanna. In 1904 it undertook to increase the traffic over these two roads by securing an entrance into New England over the New York, New Haven & Hartford system. One of these two roads had a connection in Pennsylvania with the New England Railroad, which was then operating a line (under various arrangements) from Slatington, Pa., to Campbell Hall, N. Y., where it connected with roads running into New England. With the object stated—the increase of traffic over the two roads referred to—the Navigation Company acquired the capital stock of the New England Railroad, and merged the three roads. Thus enlarged, the New England Railroad connects with the Central Railroad at Bethlehem, and with the Lehigh Valley at Slatington. It has other connections, also—at Campbell Hall, with the New York, New Haven & Hartford, with the West Shore, with the Erie, and with the New York, Ontario & Western; at Slatington, with the Reading Railway; at Martins Creek, with the Pennsylvania; at Portland, with the Delaware, Lackawanna & Western; and at Hainesburg Junction with the New York, Susquehanna & Western. From this junction point it reaches tidewater at New York under a trackage agreement with the New York, Susquehanna & Western. Moreover, the Navigation Company desired a direct outlet from its mines in the Panther Creek valley to New England points by the way of the New England Railroad. Neither the Central Railroad nor the Lehigh Valley (both of whose lines connect with the New England Railroad) would agree to a suitable through rate and traffic arrangement, and accordingly the

Navigation Company determined to extend the New England Railroad to Tamaqua, where a connection could be made with the Panther Creek Railroad. The extension was built in 1911–12, and the reasons therefor were to provide an additional outlet to market for coal from the Schuylkill and Lehigh regions, and to compete in rates and facilities with the lines of the Lehigh Valley and of the Central Railroad. In June, 1913, the Panther Creek Railroad with its equipment was bought by the New England Railroad, and the two roads were merged and are now operated by the New England Railroad. As now extended, the New England Railroad is the most direct route from these two regions to points in New England. Thus a new competitor was introduced, railroad competition was stimulated, and shippers were benefited.

The answer of the *New England Railroad* avers that its lines serve the slate, the cement, and other industries, only about 25 per cent. of its tonnage being anthracite. Its lines did not reach the coal field until 1912. It avers, also, that its most important extension is the most recent, by which the Navigation Company's gathering railroad (the Panther Creek) is reached at Tamaqua, because this connection has given the Navigation Company better routes and facilities, has given it an additional route not before available to tidewater at New York and also to points reached by the Lehigh Valley system, and has also opened an additional route from the Navigation Company's mines, not only to the slate and the cement regions of Pennsylvania, but also to other points in New Jersey, New York, and New England. The answer avers, further, that since the New England's stock was acquired by the Navigation Company competition by railroad has been stimulated, because the Navigation Company has supplied the necessary capital for improvements, extensions, and equipment. As an example, it avers that, whereas coal shipped from the Lehigh and the Schuylkill regions to New England points over the Poughkeepsie bridge route were formerly carried by the Hudson River Railway, the New England Railroad now carries a proportion of this tonnage, this being a result of the connection made with the Panther Creek Railroad. It denies that a common control governs the New England Railroad and the Hudson River Railway, and avers that the persons in control of the latter have no financial or other interest in the former, and no voice or influence in its management and operation. It declares itself to be a competitor of the Central Railroad and of other lines in carrying coal and other commodities to tidewater, to New England, and to other points, and denies the existence of restrictive agreements with any of them. For years, especially since 1900, its extension has been constant, its usefulness as a common carrier has increased, and its facilities have served the public better. It has given the Lehigh Navigation Company and all other shippers additional communication with points in New York, in New England, and in the West, and its conduct as a common carrier has been fair and without discrimination. Its present status is declared to be vital to the welfare of the Navigation Company, and to vast cement, slate, and other industries, and any interference therewith would be likely to result

in some competitive and antagonistic interest obtaining control, to the detriment of the territory now served by its lines.

The answer of the *Hudson River Railway* avers that it has repaid the money advanced by the Lehigh Navigation Company and the Central Railroad, and that these advances were made to build and maintain a line to be operated by the Hudson River Railway in competition with the then existing lines between points in New England and in the section immediately west thereof, so as to facilitate traffic between these points. It avers, further, that after its lines were extended its traffic did increase greatly, thus justifying the extension and benefiting the public and other railroad companies not parties to this suit. It avers that its traffic rates and charges have largely diminished during the period referred to, and that traffic is carried over its lines as cheaply as by any other railroad operating by any route between the same points.

Other matters will be touched upon in the course of the discussion. The following diagram may make the situation easier to comprehend. There are two groups of corporations, headed by the Holding Company and by the Lehigh Navigation Company, respectively:

1. HOLDING Co. owns stock of
- Schuylkill Navigation Company
- Wilmington & Northern Railroad
- Reading Railway (which is also lessee of the Wilmington & Northern Railroad)
- Coal & Iron Company which owns stock of { Wilkes-Barre Coal Co. / Hudson River Ry. (in part). }
- Central Railroad and is lessee of Lehigh & Susq. R. R. (which belongs to the Lehigh Nav. Co.)

*Lease of March, 1871*

2. LEHIGH NAV. Co., whose stock is not owned by the other companies, owns
- Lehigh & Susquehanna Railroad (but leased it in March, 1871, to the Central Railroad)
- Lehigh Canal (and is also the lessee of its continuation, the Delaware Division Canal)

And owns stock of { Hudson River Railway (in part) / New England Railroad }

## Discussion.

Without going into details we may dispose briefly of one or two matters.

First. *The Quantity of the Unmined Deposit.* On this subject opinions differ, and in the nature of things the quantity cannot be accurately measured. The only light that is available comes from calculations that vary in results, and some of the evidence warns us to be cautious in relying upon these estimates. For present purposes we think it sufficient to say that the unmined deposit seems to be very large indeed; it is not likely to be exhausted for two or three generations at least, even at the rate of mining now practised. We feel justified, therefore, in leaving the remoter future to take care of itself; our concern is with the present, and with so much of the future as lies fairly near. Accordingly, we shall not attempt to estimate in hundreds of millions the tons still in the ground, but shall

content ourselves with the rather vague,, but we think the sufficient, statement that the field still contains a supply that will apparently supply the demand for not less, probably for much more, than 50 years.

Second. *The Canals,* and *the Wilmington & Northern Railroad.* Little need be said about these. The evidence satisfies us that all of them are negligible factors, which may be disregarded. The bill may therefore be dismissed as to the Wilmington & Northern Railroad, and relief will be denied as to the canals.

But the other transactions need further consideration, and these will now receive attention.

*Lehigh Navigation Company.*

[1] Evidently the relation of the Lehigh Navigation Company to the Holding Company is a matter of much importance, and seems to come first in order. As will be observed, the essential connection between the two principal groups is the lease of the Lehigh and Susquehanna Railroad, made in 1871, and modified in 1883 and 1887. If the lease is not in violation of law, the Navigation group drops out of this litigation. We may dismiss from consideration the minor charge concerning the holding of stock by the Navigation Company and by the Central Railroad in the Alliance Coal Company and the Wilkes-Barre Coal Company. The stock of the Alliance Company consists of 90,000 shares. Of these, the Navigation Company holds 83,920, and the Central Railroad 6,000; the remaining 80 shares being held by other interests. The stock of the Wilkes-Barre Coal Company consists of 184,250 shares. Of these the Central Railroad holds 169,823, and the Navigation Company 500 (which it took originally as collateral for a note, and was obliged to buy in when its debtor made default); the remaining 13,927 shares being held by other interests. The evidence does not show that the holdings in these two companies owned by the Navigation Company and by the Central Railroad, respectively, have been unlawfully used in combination or otherwise; on the contrary, the Navigation Company and the Wilkes-Barre Coal Company have been active competitors for the sale of coal during many years. And so, also, we may dismiss the charge about certain lateral allowances in freight rates on coal. If they are objectionable for any reason, the correction cannot be made in this forum; the Interstate Commerce Commission has primary jurisdiction of these matters, and to that tribunal the government or any other complainant must be referred.

Turning now to the lease of 1871, we may say, first, that of course neither party could have intended then to violate a federal statute that was not passed until nearly 20 years afterward. The reasons for making the lease have already been referred to, but they may be stated again. The parties acted under legislative sanction, and we are satisfied that the agreement was greatly to the benefit of both companies. Indeed (since the Lehigh Canal need not be considered), the government attacks the lease on two grounds only: (1) Because it suppressed competition between the Navigation Company and the Wilkes-Barre Coal Company in the production and sale of anthracite; and' (2) because it requires the Navigation Company to ship

three-fourths of its output over the Central Railroad, and thereby restricts unreasonably the Navigation Company's freedom to select its own markets and otherwise to carry on its business, thus preventing other carriers in the same locality from competing with the Central Railroad for the carrying of such output.

The answer to the first objection is to be found in the evidence; the lease fostered competition, instead of suppressing it. The reasons that induced the Navigation Company to lease its railroad are fully set forth in the following report made by the Board of Managers to a special meeting of stockholders held March 28, 1871:

"The stockholders have been called together to consider and act upon a lease to the Central Railroad Company of New Jersey of the railroads owned and controlled by this company, and also to consider an act of the Legislature giving the company authority to fund and consolidate their various forms of indebtedness.

"To understand fully the causes which led to the negotiations which have terminated in the lease of our railroads, it is necessary to refer to events which have transpired during the last three years.

"The Lehigh & Susquehanna Railroad was opened for business throughout its entire length early in 1868, when the coal trade was greatly depressed, and the company, already burdened with debts incurred in its construction, found it necessary to incur further obligations, at high rates of interest, to equip the road and increase its facilities for business, without which it could not be a source of any considerable revenue to the company.

"The capacity of the railroads across the state of New Jersey to transport coal was then limited by inadequate terminal facilities or insufficiency of motive power, and, with other large roads previously in the field pressing coal upon them, we had from the first a contest to secure proper facilities for the transportation of the coal carried to the Delaware river by our railroad for markets beyond. A contract made with the Morris & Essex Railroad Company, in September, 1868, provided railroad transportation and terminal facilities for only a portion of what we had to offer, and that only for a period of five years, and it was not until the fall of 1869 that we could secure adequate terminal facilities from the Central Railroad of New Jersey, although they were ready at an earlier period to transport coal for us. The uncertain tenure secured in 1869 was, after negotiations extending during a period of nearly a year, rendered reliable and satisfactory for a limited period by a contract executed on 1st November, 1870, which secured to the company full terminal and other facilities for all the coal we might be prepared to offer to the Central Railroad of New Jersey during the running of the contract, and a pro rate of charges on coal from the Wyoming region to tide. Until the execution of this contract—which continues in force for four years, and is subject to termination six months thereafter—we had no satisfactory arrangement for the delivery in New York waters of the great bulk of the coal offered to us for transportation by railroad. These contracts, however, extend only for a few years, at the expiration of which time the Lehigh & Susquehanna Railroad might find itself in an isolated position. Its principal business must ever be the transportation of coal and other merchandise to New York or its vicinity, to which three New Jersey roads offered certain facilities—the Morris & Essex, Belvidere Delaware, and the Central Railroad of New Jersey. The Morris & Essex, since the contract made with it in 1868, had fallen into the hands of a rival coal company, whose roads were extending to points reached by the Lehigh & Susquehanna Railroad, so that its interests would be adverse to fostering the interests of this company. The Belvidere Delaware Railroad is owned by the Camden & Amboy Railroad Company, which is well known to be negotiating to transfer its roads to a company whose interests are not identical with our own, and which might not be disposed to aid us in furnishing facilities for developing a large business in the future. Should the Central Railroad Company—thus left as our only satisfactory outlet—join its interests to others antagonistic to our own, we would, at the expiration of our

contract, be left at the mercy of our rivals, or be obliged to protect the millions already invested by a further expenditure to aid in building a new railroad across New Jersey.

"The contracts with the New Jersey roads were for the transportation of coal only, and we had no satisfactory arrangement for passengers and general merchandise. For the development of these branches of the business we felt the necessity of an immediate alliance with a company which controlled a New York terminus. The present lease must increase our revenue from these sources very largely.

"Freshets and strikes and a dull coal market for some years past have rendered it difficult for the company to provide means for the double tracking and further equipment of our roads as rapidly as needed and for the development of our valuable mining properties. We have therefore sought an alliance with another company, which would offer to that company, upon terms mutually advantageous, inducements to provide means for the development of all our interests. The result of these negotiations has been an agreement for a lease of our railroads to the Central Railroad Company of New Jersey on the following terms: [Then follow the details of the lease.]

"The results expected from this lease are:

"First. The entire relief of this company from any demands for further equipment. It relieves it also from the necessity of future expenditure for the extension of the road and its branches, required by the increase of its business, until we can secure the means at reasonable rates.

"Second. We secure the full influence and all the facilities of a powerful corporation, controlling the shortest and best line across New Jersey, in the development of the trade of all kinds on our line of railroad.

"Third. Many collateral advantages will result to our different interests from this lease, which cannot be secured by direct covenants, but must result from the efficient operation of the line and the alliance thus secured between the two companies.

"Fourth. A moderate increase on the gross receipts of last year, when our own mines were idle for six months, the mines of our principal transporter not fully opened, rates low, and business in all branches dull, will give us a sufficient revenue from the road alone to pay all of our interest beyond that provided by our miscellaneous receipts, other than those from our canals and from the mining of coal. We anticipate a steady growth of business, and believe that it will not be long before the revenue derived from this lease will considerably exceed the interest of our entire indebtedness.

"The confirmation of this lease by the stockholders will leave the company —as during the period of its greatest prosperity—a 'coal and navigation' company, with its canal and valuable Lehigh coal property, its large amount of real estate, becoming more valuable from year to year, and in addition the recently acquired tracts of first-class coal lands in the Wyoming region, which promise in the future to be a large and increasing source of revenue; also, the control of the transportation of the product of other tracts equally large and more fully developed. If the result of this negotiation shall be a return to the prosperity of that period, the managers will have great cause of satisfaction with their work."

To this we may add the following extract from the report of May 2, 1871:

"In addition to the reasons stated at the special meeting, as among those which induced the managers to enter into the negotiations for the lease, may be added the difficulty of carrying our large and increasing floating debt. The railroads were making demands on our resources for additional sidings, tracks, buildings, and equipment; and by leasing them we are not only relieved from all demands for equipment, and any present demands for money for additions to the road, but have also secured financial aid which will enable us to pay off a portion of the floating debt and fund the remainder. The sale to the Central Company of materials, machinery, and securities, including a million of bonds of our proposed general mortgage, will give us $1,500,000, and this amount, with our net receipts during the first four months after resump-

tion of work at the mines, will reduce our floating debt to less than $1,000,000. This sum we expect to provide for hereafter by the sale of bonds."

The dangerous position of the Central Railroad has already been stated in the summary of its answer given above, but for convenience we repeat the summary here:

"The Central Railroad's answer details the steps that led up to the contract of March, 1871, by which the Lehigh & Susquehanna Railroad was leased from the Lehigh Navigation Company. At first—in 1847—the Central was a short local railroad in New Jersey, but afterwards grew (always under legislative authority) into a through route across New Jersey from Easton on the Delaware river, to New York Harbor. Its connections were of great importance. At Easton it connected with the Lehigh Valley Railroad; opposite Easton, with the Lehigh & Susquehanna Railroad; at Hampton, a few miles further east, with the Delaware, Lackawanna & Western Railroad; and it also had a through connection to the West by the way of Easton, Reading, and Harrisburg, known as the 'Allentown route,' over the Lehigh Valley, the old Reading Railroad, and the Pennsylvania. From all these sources it received much business, and in order to take care of this business it was obliged to spend a great deal of money in construction and in terminal and other facilities. For example, at one time it was compelled to have a third rail in order to accommodate the Lackawanna cars, which were then of broad gauge. In 1871 the loss of a large part of this business was threatened. The Lehigh Valley had acquired or was acquiring a line of its own to New York Harbor. So was the Lackawanna; while the Lehigh Navigation Company's railroad was apparently on the point of making a traffic arrangement with the Lackawanna. The Allentown route had been disrupted, and the Pennsylvania's traffic had been lost. In this situation—having lost the Pennsylvania's traffic, much of the Lehigh Valley's traffic, with a prospect of losing the rest, and all the passenger and general freight traffic of the Lackawanna, with a prospect of losing its coal also—the Central was compelled to decide whether it would abandon competition with its rivals and resume its local character, or would become an active competitor. Choosing the latter course, it entered the anthracite field by making the lease in question. The arrangement benefited the public by creating and maintaining a through route; it benefited the Central's stockholders by giving them a permanent Pennsylvania connection; and it benefited the Lehigh Navigation Company's stockholders by giving them a tidewater outlet for their coal."

The foregoing are the facts, and we think they show that both the Navigation Company and the Central Railroad were confronting an alarming situation. The Navigation Company was likely either to be shut out from New York, the most important tidewater market, or at all events to be greatly hampered in reaching it. Unless that market could be reached on favorable terms, the company could not sell its coal in competition with the coal carried by the Lehigh Valley and by the Lackawanna & Western Railroad. If, however, the Central Railroad's route could be definitely secured, the Navigation Company could compete, and the evidence is clear that it has actively competed, and does still compete, not only with the Lehigh Valley Coal Company and the Lackawanna Coal Company, but also with the coal of the Wilkes-Barre Company, although this is the Central Railroad's own especial feeder. We think it should be distinctly noted that with rare exceptions competition for the carriage of the same anthracite coal does not exist. Each carrying company has its own tributary mines, and (largely by reason of topographical conditions) these are not reached, and are not likely to be reached, by any other carrier. The

coal is brought to the surface and prepared for market at the mines; it is there loaded upon the cars of the carrier that serves the particular mine, and by these cars it goes forward, either to its ultimate destination, or to the barges that complete the carriage when water transportation is either necessary or desirable. The competition is in the markets, and it would be idle for one carrier to attempt to interfere with a rival's traffic. The carriers might combine to fix rates at an oppressive sum; but no such combination is charged in this bill, and obviously the question whether a rate is extortionate is to be determined, not by the courts, but by the Interstate Commerce Commission.

Neither do we think the second reason is sustained by the evidence. The lease in question provides that the Central Railroad shall pay as rental one-third of the Lehigh & Susquehanna's gross receipts, with a further provision that all the coal mined by the Navigation Company from its lands, then owned or thereafter acquired, should be sent to market over the Lehigh & Susquehanna and the roads of the Central Railroad, "when destined to points or markets reached by the said roads; and, when destined for markets not so reached, it shall be sent as far as practicable over said roads. . * * *" But this covenant did not apply to one-fourth of the coal mined by the Navigation Company in the Wyoming region; this might be sent to any market "not reached by lines running toward the Delaware river." In 1883 the lease was so modified that, whenever one-third of the gross receipts should fall short of $1,114,400, the lessee should make up the deficiency; but, whenever one-third should exceed $2,043,000, the Navigation Company should relinquish any claim to the excess. And in 1887 another change was made, permitting the one-fourth referred to above to be sent to market over other lines than the Lehigh & Susquehanna Railroad and its branches, if by so doing the Navigation Company could realize a larger price or profit than it would have realized if the coal had been shipped over the Lehigh & Susquehanna.

We cannot discover from the evidence that these covenants impose unlawful restrictions on the Navigation Company's shipments. The best markets for anthracite coal are New York, Pennsylvania, New Jersey, and New England; about 75 per cent. of the total tonnage from the whole region goes to these markets, and the Navigation Company sends about the same percentage as the other producers. It has plenty of coal available for the Western market, but for reasons of economy it prefers to restrict its shipments in that direction. This restriction, however, is voluntary, and is due to the fact that its coal can be sold elsewhere to better advantage. Moreover, while its interest is best advanced by shipping a large proportion of its coal to markets reached by the Central Railroad, it evidently does not regard itself as "absolutely bound" (to use the government's phrase) to ship three-fourths of its output over that road; for in 1912 these shipments were 70 per cent. only, and in 1913 were 67 per cent. only. And its production has not been diminished, but, on the contrary, has largely increased. As stated in its report for 1906 given in evidence by the government, its percentage of increase in this particular was

largely in excess of the percentage among its competitors throughout the region; and the testimony shows that its total production now is in excess of 3,500,000 tons, more than double what it was 15 or 20 years ago.

With regard to the rental, the government's objection is based on the argument that, because the Navigation Company and the Central Railroad share in the gross receipts of the leased road, they are in effect partners in its operation. This is evident also from the government's prayer in this respect, which asks that the rental be made "a fixed sum instead of a proportion of the receipts from the operation of" the Lehigh & Susquehanna Railroad. The minimum and maximum provisions go a considerable distance in that direction already, and we think it is a practical and sufficient answer to the objection that since 1901 (except in 1902, the year of the well-known strike) the maximum rental has always been reached, and is therefore a fixed sum now. And it is likely so to continue, for under the present conditions the maximum will ordinarily be reached three or four months before the end of the year, so that a considerable margin for contingencies exists.

For the reasons thus given we are of the opinion that the lease of the Lehigh & Susquehanna Railroad does not offend against the laws of the United States. It follows that the unlawful connection charged by the government to exist between the two groups referred to above has not been proved, and that the Lehigh Navigation group should be excluded from further consideration. If the corporations embraced therein have otherwise offended against the federal statutes, they should be attacked separately; and therefore the bill will be dismissed as to them, but without prejudice to the government's right to take such other action as may appear desirable.

*The Reading Group.*

Since the bill is also to be dismissed as far as the Schuylkill Navigation Company and the Wilmington & Northern Railroad are concerned, we have left for consideration the charges against the Holding Company, the Coal & Iron Company, the Reading Railway, and the Central Railroad in its relation to the Reading interests.

We do not think much time need be spent upon the charges that antedate the Reading reorganization in 1896. The bill makes certain averments of illegal and improper conduct during the earlier period against the old Reading *Railroad* and the Coal & Iron Company, and these are vigorously and circumstantially denied; but we do not feel called upon to go back to that period in order to apportion whatever blame may now appear to be deserved. It was a time of unrestrained competition, of violent industrial warfare, and of legislation believed now by many persons to have been unwise. As a matter of common knowledge we may take note of the fact that during that period much was done that is condemned at present by general opinion, although the practises now reprobated were then the commonplaces of business in some of its most important branches. Such transactions cannot be fairly judged, except by realizing the situation that was then pre-

sented and applying the standards that were then accepted without much dissent; and we see no need to essay that difficult task. It is sufficient, we think, to take the actual condition of things at the time of the reorganization—no matter how that condition had come to exist—and to see how it was dealt with thereafter. We are now considering the suit so far as it is based on the act of 1890—the commodities clause will be taken up hereafter—and the defendants do not deny the obligation to conform their conduct to the commands of that statute. We think they are not to be held liable in this proceeding for transactions that took place before the intervention of Congress.

And we may say in passing that we lay no weight upon the fact that for three years—from 1893 to 1896—the old Reading Railroad and the Coal & Iron Company were in the hands of receivers, and were administered by the United States court in this district. Of course it is not to be assumed that their business was carried on during those years in violation of law; as far as we are advised, no such question was ever raised or suggested; the court simply took the Coal & Iron Company and the old Railroad as it found them, and conducted their business while a plan for reorganization was being perfected, and then made the necessary decree to carry the plan into effect. We do not know whether the act of 1890 was considered in its relation to the plan, and we approach the consideration of the present charges uninfluenced by the former action of the court.

[2] We have then before us a group of three corporations as they appear after the reorganization was complete. One of them is a mining company, one a carrying company, and the other is a holding company owning the capital stocks of the other two. This relation has had the sanction of the Pennsylvania statutes; but the federal law is supreme in the field of interstate and foreign commerce, and the law of a state cannot authorize its citizens, either individual or corporate, to violate a constitutional act of Congress. Phila., B. & W. R. Co. v. Schubert, 224 U. S. 603, 32 Sup. Ct. 589, 56 L. Ed. 911. The three companies are no doubt combined; but the important question remains: Is the combination unlawful? Does it unreasonably restrain trade in anthracite coal? And by "trade" we mean the production and marketing of that article.

There has been a recent occasion in this district to consider the scope of the act of 1890 (U. S. v. Keystone, etc., Co. [D. C.] 218 Fed. 502), and we shall not repeat what was said in that case. But, as the defendant there was a manufacturer, while other kinds of business are now in question, it may be proper to add a few words on the particular subject in hand.

As we have already stated, the government does not attack the mining company—the Coal & Iron Company—for the bill expressly states:

"Whether the [Coal & Iron] Company in and of itself is a combination in restraint of interstate trade and commerce, or a monopolization of a part thereof, is an issue not now tendered or intended to be raised in the present proceeding."

It is not difficult to see good reasons for this position. Coal is of no use while it remains in the ground. Its use is to be burnt, and no one can use it until it is brought within convenient reach. Obviously, then, whoever mines and prepares it for consumption performs a service to be commended. Moreover, the owner of coal in the ground, who has no other interest in the mineral than to sell it, is not in the position of an ordinary merchant, who buys goods from the manufacturer in order to sell them again to the ultimate consumer. The stock of such a merchant is in process of continual renewal; as long as the mills are running his source of supply is always open, and he need not be greatly concerned about keeping a large stock on hand. But a miner's stock is in the ground; he is his own source of supply, and he can only continue to sell as long as his mine continues to produce. It is vitally important to him, therefore, that he should have a large reserve on which he may draw; for he must go out of business when his source of supply is exhausted. It is elementary prudence, therefore, to look ahead and provide for the future. If he is a miner of coal, he must have coal lands; and, since coal is a much desired article, he is not only serving himself, but serving the consumer also, when he takes the necessary measures to prevent the supply from being exhausted or interrupted. And we are not aware that any federal statute has declared it unlawful to lay in a large supply of raw material in order to carry on business for a considerable time. The mere size of his stock does not make a merchant an offender against the law. And especially should this be true, if in making his purchases he has acted under authority from a competent legislative body.

But after a miner raises his coal to the surface and prepares it for consumption, it is still of little value. He may use some of it himself, or may sell it to his neighbors; but this is a restricted market, and can only benefit a few. To make the best use of his product, he needs many markets and many customers, for only thus can he make the most profit for himself and bring a desired article within the reach of the numerous persons that wish to use it. To accomplish these results he must of necessity use the recognized agencies of transportation, the railroad and the barge or other vessel, for only thus can he and the consumer be brought together. Now, whatever promotes this result should ordinarily be encouraged, for trade is thereby created or nourished. If, therefore, a miner should find it economical and otherwise advantageous to build his own railroad, this of itself would seem unobjectionable, and even commendable. And if he had the right to own his own railroad, as well as his own mine, there would seem to be no special objection against a sale of both to another person, or against his putting them both in the hands of the same trustees for his own benefit.

Of course, this is abstract reasoning, and we are aware that concrete and practical objections may be made to it in part; but we think it will throw light on the problem before us. In 1896 the Coal & Iron Company was the owner of a large body of coal land—the precise quantity or the proportion it bears to the whole deposit does not seem

to be presently important—and had been mining for years. Anticipat-
ing the future, its purchases had been beyond its present needs; but
this of itself was not a violation of law, even although its holdings had
come to be large. Its product was much desired by many people, and
the cessation of mining would have seriously affected the industry
of the country and the comfort of many households. The state of
Pennsylvania had given it ample authority to buy and hold the land,
and indeed no one was attempting to take the property away, or to
prevent the company from using it. The mines were so situated that
the only railroad it could use at all—or, at all events, could use advan-
tageously—was the Reading Railway, and if it were shut out from
this means of getting to market its customers could not obtain the
coal on which they were accustomed to rely. Now (laying the com-
modities clause aside) we do not see with clearness in what the un-
lawfulness of the Coal & Iron Company's conduct can be said to con-
sist. Its business, the mining of coal, was lawful; its ownership of
coal lands was lawful; and its use of the Reading Railway to get to
market was also lawful. The Railway and the Coal & Iron Company
were not competitors; each performed its own function in putting
a useful article into the hands of consumers. Although the Coal &
Iron Company was a large producer of coal, and therefore a large
shipper and a large seller, the size of its business was not in itself
an offense. Indeed, in some aspects it may be regarded as a merit,
for the more coal the company produced the more extensive would
be its operations, thus benefiting labor and the merchants that furnish
supplies to the mines, and the larger would be the quantity of coal at
the consumers' command. But it is true that, while much of its con-
duct may have been lawful, the Coal & Iron Company and the Rail-
way—separately or in combination—may have offended against the
statute in other particulars, and, if so, they must answer for whatever
misdoing has been proved.

[3] Much of the government's complaint seems to rest on the ad-
mitted facts that the Coal & Iron Company's land holdings are large,
and that the company ships and sells the largest percentage of all the
coal that reaches the market. But this is not enough; before these
facts can be counted as an offense under the statute, it is necessary
to go further, and to show that harm has been done, or is likely to
be done. Who has been injured thereby, and in what manner? At
this point the government's proof appears to be insufficient. The com-
bination complained of came into existence nearly 20 years ago, and
it is certainly not without significance that the evidence of injury is
so speculative and so vague. We shall speak of one or two appar-
ently objectionable matters in a few moments; but (laying them aside
and speaking generally) we may say that very little definite proof of
injury has been offered. As far as we can see, only three classes of
persons could be injured: (1) Rival producers on a large scale, who
might be injured by unfair methods of competition; (2) smaller pro-
ducers, who might suffer by similar methods; and (3) the consumer,
who might suffer by extortionate prices. As to the first class, there
is no evidence whatever on this subject, and we have heard no argu-

ment that unfair methods of competition have been used. As to the consumer, no effort has been made to prove that the prices of coal have been oppressive, and we cannot assume it without proof; indeed, although the bill does charge that extortionate profits have been made in mining and in carrying coal, the charge was abandoned, and the government's brief says nothing about it. The smaller producer, however, may have some ground for complaint, and to this we shall turn our attention briefly.

The bill avers that the Holding Company became the owner of the old *Railroad's* claim against the Coal & Iron Company, and carries it as an open account upon which interest is not regularly charged, and (when paid at all) is only paid at small and varying rates. Although it is denied that the debt is now the property of the Holding Company, and although there is some obscurity on this subject, we are inclined to believe that the denial is more formal than substantial. There is positive evidence to the effect that the Coal & Iron Company owes this debt to the Holding Company, and some positive evidence to the contrary; but the debt is certainly carried on the books of both companies as an open account between them, and installments of interest are certainly being paid thereon from time to time. The Holding Company's answer admits:

"That there is carried on the books of this defendant, in an open account with said Coal & Iron Company, the amount—less certain deductions—of that company's debt to the Philadelphia & Reading Railroad Company and its receivers as it stood on November 13, 1896, amounting at that time to about $69,000,000, together with the above-mentioned accretion; that on account of interest, other than interest on commercial loans, it has received from the said Coal & Iron Company only the following amounts:

| | |
|---|---|
| In 1900 | $ 884,850.18 |
| " 1901 | 886,504.62 |
| " 1902 | 888,780.61 |
| " 1903 | 1,582,334.41 |
| " 1904 | 1,582,477.77 |
| " 1905 | 1,582,255.21 |
| " 1906 | 1,583,304.53 |
| " 1907 | 1,583,914.05 |
| " 1908 | 1,584,485.40 |
| " 1909 | 935.003.19 |
| " 1910 | 743,957.87 |
| " 1911 | 320,000.00 |
| " 1912 | 810,998.97 |
| " 1913 | 2,269,405.15" |

(But the sum of $12,000,000 paid by the Holding Company since 1896 is not to be added to the amounts that were advanced to the Coal & Iron Company by the old *Railroad* Company. This sum was used to pay prior liens on the property of the Coal & Iron Company— known as "divisional coal land bonds"—and was obtained by the sale of bonds reserved for this and other purposes under the general mortgage of January, 1897.)

In the same connection the government avers that the old Railroad Company gave rebates of freight to the Coal & Iron Company, and that the Reading Railway is now the owner of the old Railroad's claim on this account. Moreover, the Railway is charged with giv-

ing habitually an undue and preferential credit to the Coal & Iron Company for similar charges. The facts concerning the charge of undue credit are that weekly settlements of such rates are exacted from all shippers, with rare exceptions, and that bonds to secure payment are ordinarily required, except in the case of a few large shippers. The Coal & Iron Company, however, gives no bond, and is continually allowed credits of 30 to 90 days. Its current indebtedness for freight during the past 6 years has always approximated $1,000,000, and on this sum no interest is either charged or paid. The government's complaint with regard to these matters is thus stated in the brief:

"These advances and accommodations extended by the Railroad Company to the Reading Coal Company constituted rebates to the [Coal] Company and unlawful discriminations against other shippers along the line of the Railroad Company, in violation of sections 2 and 3 of the Act to regulate commerce, [Act Feb. 4, 1887, c. 104] 24 Stat. 379, 380 [Comp. St. 1913, §§ 8564, 8565]."

The charge, therefore, is that the Holding Company has inherited, and is continuing, a discrimination in rates to the prejudice of other shippers along the line of the present railway; and if this be true the remedy is not within our power, but must first be sought from the Interstate Commerce Commission, which has primary jurisdiction of such matters

Complaint is also made against certain leases of coal lands that have been made to other producers since 1896 by the Coal & Iron Company, or by one of its subsidiaries. These leases of its own lands contain covenants requiring the lessees to ship the entire product over the Reading Railway system, or by such route as it may designate. The average annual output from these lands is said to be more than 1,300,000 tons. It is merely the compulsory feature of these covenants that is attacked, and abstractly considered it may perhaps be objectionable. Practically the result is not likely to be considerable, for nearly all the lessees have no other railroad available; but in theory the lessees should be left free to ship as their convenience and advantage may dictate, in case other routes should be available, and if the government thinks the subject sufficiently important, we think the compulsory feature should be canceled.

A further complaint is made because the Coal & Iron Company, both before and since 1896, has purchased coal from independent producers. These are not the 65 per cent. contracts referred to in the former case, but are voluntary contracts of purchase and sale, entered into because the parties believe them to be mutually advantageous. We do not find anything objectionable therein, but in any case they have been constantly diminishing during the last 10 years, and we think are no longer (even if they ever were) a factor that need be considered.

Except as stated, no discrimination or oppression against other producers and sellers has been proved against the three Reading Companies. No dealer has been prevented from going into business, and no shipper has been prevented from shipping all he produced. The Coal Company meets competition in all the markets it reaches. Everywhere along the Reading Railway, the coal of other shippers over

that route meets its own coal, while at many points the Pennsylvania Railroad and the Lehigh Valley Railroad bring the product of other mines. In more distant markets, it faces the competition of all its great rivals. Neither is there any proof that the price of coal has been extortionate or unreasonable. Even in times of scarcity, there has been no exaction of higher prices, although in such a situation some of the independent producers have taken advantage of the public need. The rates of freight have remained for years substantially as they now are, and (except in the case of certain shippers over two other roads, not defendants, that reach the anthracite field) the Interstate Commerce Commission with full power of regulating the subject has not interfered with these rates. Indeed, the Commission heard and dismissed a complaint against the reasonableness of the rates charged by the Reading Railway and other carriers at the suit of Wm. R. Hearst several years ago. Neither does the evidence support the charge of the bill, that "the transportation of anthracite by railroad at the rates now and for a long time past in force has been and is enormously profitable"; and this charge is not pressed in the government's brief. And the mining of coal during the years from 1898 to 1913, inclusive, has resulted in a profit to the Coal & Iron Company of no more than 18½ cents per ton, while its miscellaneous receipts increase its income to about 20 cents.

In our opinion, therefore, the principal charges against the three Reading Companies have not been sustained.

*The Central Railroad.*

[4] This brings us to the Holding Company's purchase of a controlling interest in the Central Railroad's stock. In the carriage of coal the Reading Railway and the Central Railroad are not competitors, for as has been stated they do not reach the same collieries and do not compete for the same shipments. And the conformation of the country between the coal regions and New York and Philadelphia is such that competition in carriage, even by a future extension of their lines, is practically out of the question. The coal producers on the line of one railroad cannot ship now, and are not likely to ship in the future, directly over the line of the other. They would have to reach the other line by a roundabout and indirect route that would ordinarily be inconvenient and disadvantageous. But both these railroads reach the same general field, the same general source of supply, and carry a similar article to many of the same markets; as one of the witnesses testified, "It is a competition of markets," and we shall regard the subject in that aspect. For this reason the Central Railroad should not be considered merely as a carrier, but also as the owner of nine-tenths of the stock in the Wilkes-Barre Coal Company, which is a large miner and shipper, and is an important competitor of the Coal & Iron Company. So that the situation is this: The Holding Company, already the owner of the capital stock of the Reading Railway and of the Coal & Iron Company, became the majority stockholder in the Central Railroad Company, which owns nearly all the stock of the Wilkes-Barre Coal Company. The two railroads have been carrying the coal of these two large producers

to many of, the same markets, where the coal has been sold in competition. These carriers transport about one-third of the total tonnage of anthracite carried by all the railroads that reach the anthracite field, and the two coal companies dispose of more than .20 per cent. of all the coal taken by the market. Together they operate 45 collieries out of 276, and 5 washeries out of 51. There are about 120 other producers, marketing about 50,000,000 tons.

Upon the facts thus stated we think the union of these interests in the Holding Company is condemned by the rules laid down in the Northern Securities Case, 193 U. S. 197, 24 Sup. Ct. 436, 48 L. Ed. 679; and in U. S. v. Union Pac. R. R. Co., 226 U. S. 61, 33 Sup. Ct. 53, 57 L. Ed. 124. It must not be overlooked that the sole subject of the present suit is the interstate and foreign trade in anthracite coal, while the Reading Railway and the Central Railroad interchange a vast amount of other traffic which is of very great value to both systems. This traffic is not complained of in any particular; its importance was pointed out by Judge Lanning in the former suit, and unless the friendly and mutually advantageous alliance of the two railroads in this particular must be destroyed in order to reach an unlawful combination in another particular that would otherwise escape, we are not disposed to disturb the ownership of the Holding Company in the Central Railroad's stock. The railroads that were affected by the Northern Securities Case and by the Union Pacific Case differ in many respects from the roads that serve the anthracite field; and (if the Reading Railway and the Central Railroad alone were concerned) the argument of counsel that lays stress on these differences would require careful attention. But, since the real competition with which we are now concerned is in the markets, and not between the carriers, we cannot consider these two railroads alone. The two coal companies also must be taken into account, and in our opinion it is their union that lends most force to the government's complaint. As we understand the facts, if the Central Railroad were divorced from the Wilkes-Barre Coal Company, the object of the bill would in this respect be substantially attained, and (as this particular matter was not argued by counsel) we suggest it for their consideration when the scope of the decree comes to be determined.

### Commodities Clause.

[5] Since the Lehigh Navigation Company need no longer be considered, and since the government will have no complaint against the Wilkes-Barre Coal Company if the foregoing suggestion be finally adopted, the commodities clause calls for attention only in its bearing upon the relation between the Reading Railway and the Coal & Iron Company.

The clause forbids a railroad company to carry in interstate commerce after May 1, 1908, any article or commodity (with certain exceptions) "manufactured, mined, or produced by it, or under its authority, or which it may own in whole or in part, or in which it may have any interest, direct or indirect." Act June 29, 1906, c. 3591, § 1, 34 Stat. 585 (Comp. St. 1913, § 8563, cl. 6). The general subject

has recently been discussed in U. S. v. Del., Lack. & West. R. R. (D. C.) 213 Fed. 240, and we shall not repeat what was there said, although we may be allowed to refer to the opinion for a summary of the litigation concerning the carriage of anthracite coal. The situation now before us is not the same as in the Lackawanna Case. There the railroad owned and mined the coal, and the government's position was that either the ownership or the interest of the railroad continued; here the Railway Company neither owns the land nor operates the mines, and the questions are (1) whether the coal is nevertheless in substance and reality mined or produced by the Railway Company or under its authority; (2) whether that company, while transporting the coal, has any interest therein, either direct or indirect.

These two questions are connected almost inseparably, and we shall make no attempt to keep them apart. On both of them the Supreme Court has already pronounced, and our only duty is to apply the rules thus laid down. They may be stated as follows: The act of 1906 does not forbid a railroad to hold stock in a manufacturing, mining, owning, or producing corporation, if such corporation be a bona fide organization. Commodities manufactured, mined, owned, or produced by such a corporation may be lawfully carried by the railroad, although the railroad be a stockholder in the producing corporation; and this is true without regard to the extent of the railroad's stock ownership, which may be a part or the whole. But—and the following prohibitions of course bear on the good faith of the relation between the two corporations, either in their original alliance, or in their subsequent management—the railroad company must not use the power given by such ownership to obliterate the distinction between the two organizations; it must not exert such power so as to commingle indistinguishably the affairs of both, and thus cause both corporations to be one for all purposes; it must not destroy the entity of the producing or owning corporation, and thus make the two virtually one. If it actually do these forbidden things, then the commodities clause applies and condemns as unlawful such abuse of a lawful right. But it is the abuse that is unlawful, not the mere existence of the relation or of the right growing out of the lawful ownership of stock.

And we have a clear declaration by the Supreme Court about the meaning of "any interest, direct or indirect," in the following language (213 U. S. 413, 29 Sup. Ct. 527, 53 L. Ed. 836):

"It remains to determine the nature and character of the interest embraced in the words 'in which it is interested directly or indirectly.' The contention of the government that the clause forbids a railroad company to transport any commodity manufactured, mined or produced, or owned in whole or in part, etc., by a bona fide corporation in which the transporting carrier holds a stock interest, however small, is based upon the assumption that such prohibition is embraced in the words we are considering. The opposing contention, however, is that interest, direct or indirect, includes only commodities in which a carrier has a legal interest, and therefore does not exclude the right to carry commodities which have been manufactured, mined, produced, or owned by a separate and distinct corporation, simply because the transporting carrier may be interested in the producing, etc., corporation, as an owner of stock therein. If the words in question are to be taken as embracing only a legal or equitable interest in the commodities to which they refer, they cannot be held to include commodities manufactured, mined, produced, or owned,

etc., by a distinct corporation merely because of a stock ownership of the carrier. Pullman Palace Car Co. v. Missouri Pac. R. R., 115 U. S. 587, 6 Sup. Ct. 194, 29 L. Ed. 499; Conley v. Mathieson Alkali Works, 190 U. S. 406, 23 Sup. Ct. 728, 47 L. Ed. 1113. And that this is well settled also in the law of Pennsylvania is not questioned. It is unnecessary to pursue the subject in more detail, since it is conceded in the argument for the government that, if the clause embraces only a legal interest in an article or commodity, it cannot be held to include a prohibition against carrying a commodity, simply because it had been manufactured, mined or produced, or is owned by a corporation in which the carrier is a stockholder."

With these rules to guide us, let us examine the evidence.

The government's brief asserts that the transaction in 1896 by which the three Reading Companies were brought into close alliance was "a mere subterfuge and sham." A priori, we think it unlikely that those who were responsible for so huge a transaction, involving hundreds of millions of property and affecting the fortunes of numerous investors large and small, should risk the financial disasters sure to follow such a blunder as an attempted trick—to speak only of their intelligence and not of their character. And the evidence discloses what might be expected, namely, that anxious care was taken to obtain assurance that what was proposed was lawful. The charter of the Holding Company belongs to a class known in Pennsylvania as "omnibus" charters, which were granted by the Legislatures of 40 or 50 years ago with a freedom that is now generally regarded as injudicious. They conferred numerous and extensive powers and privileges that can no longer be combined in one corporate organization. But they were granted in the undoubted exercise of lawful legislative power, and the validity of the grant cannot be questioned. Many of them have perished, but some have survived, and under them very important rights have grown up; the existence of these charters may perhaps be regretted, but their right to exist cannot be denied. For example, the Holding Company's charter, which was granted in 1871, is exactly the same as the charter of the Pennsylvania Company granted in 1870, under which the Pennsylvania lines west of Pittsburgh are now owned and controlled. As Pennsylvania had adopted a revised Constitution in 1873, it was obviously of the first importance to ascertain whether the Holding Company's charter had been affected by the Article that declared invalid "all existing charters or grants of special or exclusive privileges under which a bona fide organization shall not have taken place and business commenced in good faith at the time of the adoption of this Constitution." Accordingly, the question of the charter's validity and of its sufficiency for the purposes of reorganization was submitted to the opinion of 12 eminent counsel— George F. Baer, James Boyd, J. D. Campbell, Samuel Dickson, Thomas Hart, Jr., John G. Johnson, Victor Morawetz, Edward M. Paxson, Edward J. Phelps, George L. Rives, Francis Lynde Stetson, and F. W. Whitridge—who agreed in the following advice:

"In our opinion the Reading Company can legally acquire, receive, and hold, and can mortgage and pledge, all the stocks, securities, and properties, including the capital stocks of the new Railway Company, and of the Coal & Iron Company; and it can keep and perform all covenants and conditions under which severally and respectively these two companies acquired their

properties from the purchasers. By a further increase of its capital [which was afterwards made] the Reading Company can legally issue the common and preferred stock and the bonds required by the plan of reorganization; and to secure the payment of these bonds it can lawfully pledge and mortgage the stock, securities, and properties by it so acquired."

Soon afterwards, early in January, 1897, the validity of the charter came before the Attorney General of Pennsylvania, who gave the subject careful consideration, and was constrained to the conclusion—evidently against his wishes and his prepossessions—that the commonwealth of Pennsylvania could not successfully attack the chartered rights of the Reading Company that had been exercised before January 1, 1874—"which business was of the same general character as that in which it proposes to engage for the purpose of controlling the stocks of the Railway Company and the Coal & Iron Company."

It is not necessary to quote from the charter. The Holding Company's power are unusually varied and extensive, and the government does not deny that formal and complete legislative authority exists to do the acts complained of; and the state of Pennsylvania has never contended that the company has exceeded its powers.

The Railway Company is a Pennsylvania corporation chartered in November, 1896, with the ordinary powers of a railroad; practically all its stock is owned by the Holding Company. The Coal & Iron Company has had a continuous existence since March, 1871. Its principal object is stated to be "to purchase, sell, transport, and mine coal, and to mine and manufacture iron"; and for this purpose it has power to buy or lease "such lands as they may deem expedient." It is also empowered "to subscribe for or purchase the lands or stock of any other incorporated company in the State of Pennsylvania"; and the charter further provides that "any railroad or mining company existing under the laws of this state [may] subscribe for or purchase the stock, or purchase or guarantee the bonds, of the company incorporated." Practically all its stock is owned by the Holding Company.

In the summary of the bill already given we have stated in outline what property was sold under the decree of the Circuit Court in 1896, and what was done with the property afterwards. It is enough to say now that after the conveyances had all been made the Coal & Iron Company was again the owner of the coal lands and similar property; the Reading Railway was the owner of the railroad property, except the equipment; and the Holding Company owned the equipment—leasing it, however, to the Railway—and owned also the capital stocks of the other two companies, with some additional property. These acquisitions were the valuable basis of the Holding Company's stock, and with other securities the stock was distributed among the numerous persons entitled thereto under the plan of reorganization. We are not advised how many persons then acquired, or now own, the Holding Company's stock: but the number would undoubtedly be large. Its capital is $140,000,000, divided into 2,800,000 shares, all of which have been issued, and the shares are bought and sold on the market. In March, 1914, the 50 largest stockholders—their names and holdings appear in the record—owned

about 1,200,000 shares, par value $60,000,000; and this leaves about 1,600,000 shares, which are distributed in varying amounts among many unnamed holders. The companies are all Pennsylvania corporations; the business of mining is carried on by the Coal & Iron Company, of course exclusively in Pennsylvania; the carrying business of the Railway proper is also conducted within the state, as it must be, and each of these corporations has confined itself to its respective business since the reorganization was completed.

Thus far it seems to us that the plan now assailed by the government cannot be successfully attacked for lack of good faith; we regard it as an honest attempt to cope with a perplexing financial situation, so as to save an exceedingly valuable property for many persons whose investments were in serious danger, and an attempt to solve difficult legal problems with scrupulous regard for the law. The charters referred to gave the undoubted right to issue the securities and to make the conveyances described, and we cannot condemn as unlawful the exercise of a lawful right for a lawful purpose.

But even a lawful right, originally used for a lawful purpose, may afterwards be used to attain an unlawful object. Although the organization of the companies may have been lawful, and although their alliance may also have been lawful, the question remains: Have they since offended? And especially, have they offended against the commodities clause? To be exact: Has the Reading Railway, since May, 1908, carried coal that had in substance and reality been mined or produced by it or under its authority, or which it owned in whole or in part, or in which it had any interest, direct or indirect? In our opinion, these questions must be answered in the negative, unless the long-established legal conceptions concerning corporate organization ought not to prevail in the present case. These conceptions are so deeply rooted in the theory and practice of the law that an immense readjustment of legal rules would be necessary if the legal separateness of a corporation were to disappear and be replaced by the rights and liabilities of the individual stockholders. The theory of separate corporate entity has been of enormous value, and while it has been sometimes abused there is no doubt that industrial society is largely based upon its conspicuous features of distinct and separate existence and of limited liability. The abuses have been exceptional, and the law has not overlooked them. Where a corporation is a mere screen for an individual, or where one corporation performs a similar office for another, the device has not been allowed to stand in the way of justice and fair dealing. But we may safely say that in practically all such instances the element of fraud or bad faith is to be found, and it is certainly rare to find a situation where such an element is secure from successful attack. The cases already decided by the Supreme Court make the distinction between good faith and bad faith. In the Delaware & Hudson Case the court said:

"We then construe the statute as prohibiting a railroad company engaged in interstate commerce from transporting in such commerce articles or commodities under the following circumstances and conditions:

"(a) When the article or commodity has been manufactured, mined, or produced by a carrier, or under its authority, and at the time of transportation the carrier has not *in good faith* before the act of transportation dissociated itself from such article or commodity.

"(b) When the carrier owns the article or commodity to be transported in whole or in part.

"(c) When the carrier at the time of transportation has an interest, direct or indirect, in a legal or equitable sense, in the article or commodity, not including, therefore, articles or commodities manufactured, mined, produced or owned, etc., by *a bona fide corporation* in which the railroad company is a stockholder."

In the Lehigh Valley Case the court assumed (as the form of that dispute required it to assume) that the coal company there in question was "*not* a bona fide mining company," but a mere agent and instrumentality of the railroad, and that "abuses" in the relations of the two companies brought the production, shipment, and sale of the particular coal under the railroad's dominion, just as if it were the absolute owner; so that the entity of the mining company was destroyed, and the affairs of the two companies were so commingled in administration as to make the companies virtually one—a result that was declared to be an "abuse" of power.

If, then, the government can succeed in the present case, it must offer evidence to satisfy the rules laid down by these decisions; and this brings us to consider what facts have been proved. That the law has been consciously and deliberately violated we do not believe, and decline to find. But as the act of 1906 does not make the carrier's state of mind an essential element in the offense, the question is still open whether the Reading Railway and the Coal & Iron Company (whatever their intention may have been) have in fact so conducted their affairs as to violate the law. The government's case is substantially this:

The plan of reorganization was financed as follows: After the various properties of the old Reading Railroad and of the Coal & Iron Company had been purchased by Coster & Stetson under the decree of the United States court in this district, the purchasers conveyed the railroad properties to the new Reading Railway on November 16, 1896, and on November 18 the Railway transferred its capital stock of $20,000,000 to the purchasers and mortgaged the railroad properties in trust to secure $30,000,000, of which the sum of $20,000,000 was presently delivered and $10,000,000 was reserved "to be used in part payment for new acquisitions, constructions, and betterments upon the railroads and property of the Railway Company." It was contemplated that the Holding Company should advance the money for the purpose thus stated, and that the $10,000,000 of bonds last referred to should be used to reimburse the Holding Company for one-half of these advances. On November 18 the purchasers conveyed the coal lands, with other property, to the Coal & Iron Company, that company agreeing to join with the Holding Company in a general mortgage to be thereafter executed. On December 23 the purchasers conveyed to the Holding Company various bonds and

stocks, including the capital stocks of the Railway and of the Coal & Iron Company; conveying also the rolling stock and vessels formerly belonging to the old Railroad Company, with some other property. Apparently on January 1, 1897 (the agreement does not seem to be in the record), the Holding Company leased the equipment to the Railway by what is said to be the ordinary car trust lease, under which the Railway pays an annual rental. On January 5 the Holding Company and the Coal & Iron Company united in the general mortgage for $135,000,000 that has already been described; it is a blanket real estate and collateral trust mortgage covering the property of both companies.

These agreements contain many details. Their principal object is to provide and to secure the bonds and stocks that were required to satisfy the persons interested in the reorganization, to take care of the existing liens that were not disturbed, and to make provision for future needs—to these ends pledging as security practically all the property that had formerly belonged to the old Reading Railroad and to the Coal & Iron Company. About $69,000,000 of bonds under the general mortgage were reserved to pay outstanding liens of the old Railroad Company and of the Coal & Iron Company, these being liens prior to the mortgage, and $20,000,000 were reserved for new construction, betterment, and equipment upon the several railroads operated by the Reading Railway. The whole interest on the $99,000,000 of bonds that have been issued under the general mortgage has been paid by the Holding Company.

The government draws attention also to the fact that the Holding Company cannot declare a dividend until it pays to the trustee under the general mortgage five cents for each ton of coal mined by the Coal & Iron Company if the dividend should equal or exceed that sum, or a smaller amount if the dividend should be smaller. This does not seem to be objectionable; the probable reason for the provision is that to take the coal from the ground lessens the security of the bondholders, and therefore the money payment is intended to stand in place of the coal.

As the Holding Company owns practically all the shares of the Railway and of the Coal & Iron Company, it necessarily votes thereon and thus controls the election of their directors. Since the reorganization the three companies have had, with some exceptions, practically the same boards, and the same president, secretary, and treasurer. Since Mr. Baer's death in 1914, however, they do not have the same president. Their offices are in the same building in Philadelphia, and their annual reports are published in the same pamphlet. What the situation is in recent years with reference to the payment of salaries does not appear to be shown fully by the record, but we suppose it likely that in some instances the salary may be apportioned. Where services are performed for more than one company—for example, in the case of counsel or the purchasing agent—we can see no objection to such a division of salary.

These are the matters upon which the government chiefly relies

as tending to support the argument that an identity exists in organization and administration, and as leading to the conclusion that the Holding Company's relation to the other two companies represents "a deliberate attempt to avoid the principle of public policy then contained in the Constitution of Pennsylvania and now embodied in the commodities clause." The attitude of the government also appears in the following paragraph:

"In the present case the transactions between the Reading Companies did not begin and never have been carried on in good faith, but, on the contrary, with the purpose and result of retaining in the fullest degree the substantial identity of the transporting company and of the producing company by a merely colorable change of form."

We have already said that we are unable to find bad faith or deliberate wrongdoing. But the facts relied on by the government are pertinent and relevant to the inquiry, whether there has in fact been a violation of the commodities clause, whatever the intention of the parties may have been, and in this aspect they have received careful consideration. In our opinion they do not adequately describe the situation. The following additional facts must also be taken into account:

Neither corporation owns a single share of stock in the other, and neither has any title or interest, legal or equitable, in the real and personal property owned by the other. This separation in legal contemplation is reinforced by a separation of corporate activity; each keeps to its own affairs and does not meddle with the business of the other. The Railway has not discriminated in favor of the Coal & Iron Company, either in the distribution of cars or in the use of other facilities of transportation, and since 1897 at least no shipper has complained that the Coal & Iron Company was receiving any undue advantage. Indeed, its employés do not even ride free over the railroad, which charges and receives the usual fares for their transportation. When rights of way or other forms of occupying lands are in question, the Railway deals with the Coal & Iron Company at arm's length, as with other persons, making and carrying out contracts in the same way. The Railway buys much of its fuel coal from the Coal & Iron Company and pays in cash the regular price therefor; the quantity has ranged from 2,000,000 tons in 1898 to about 3,500,-000 in recent years. And the Coal & Iron Company pays the regular tariff rates on all its coal transported by the Railway in cars or barges; during the period from 1907 to 1912, inclusive, the amount thus paid has been as much as $10,500,000, and was in no year less than $7,500,-000.

The operative management of the two corporations is distinct. The Coal & Iron Company employs 25,000 men, and pays them with its own money and by its own paymaster. It buys its own materials, acting independently in the purchase thereof, and paying the cost out of its own funds. It keeps its own separate books and its separate bank account. In 1913 the cost of its mining operations was $26,-000,000, and the coal produced thereby was sold for $30,000,000. It

makes its own prices on the coal it sells. The executive departments of the two companies are distinct in important particulars. For example, the Coal & Iron Company has its own general selling agent, who has charge of the coal sales, and has a staff of 25 to 50 men under him. It has sales agencies in eight of the principal cities of the country, with traveling salesmen and·solicitors, who sell coal over the eastern third of the country from Winnipeg to Galveston. From 12 to 14 per cent. of its product is sold in the West and Middle West, although the principal markets are the state of Pennsylvania and tidewater at Philadelphia and New York. Other executive offices are also distinct. The general freight traffic manager of the Railway, who is also a vice president, has been connected with the company for 40 years,.and testified that during that period he had had no connection whatever with the Coal & Iron Company. And the general manager of the Railway, also a vice president, gave similar testimony, covering the period since 1897. To which may be added the testimony of the gentleman who is now the president of the Railway, and the testimony of the Railway's comptroller. During the last 10 or 12 years the Coal & Iron Company has spent $1,000,000 a year in carrying out its policy of developing and improving its collieries. The Coal & Iron Company pays 4 per cent. interest on commercial loans made to it from time to time by the Holding Company.

The assets of the Coal & Iron Company are distinct from the assets of the Railway Company, and in 1912 amounted to more than $86,000,000. Of this total the coal lands furnished $50,000,000; yards in various parts of the country, owned by the Coal & Iron Company, furnished $2,500,000; shops at Pottsville, in the Schuylkill region, furnished $400,000; storage yards and washeries, $850,000; and the improvements and equipment at its collieries, $13,000,000.

The facts point to a separation in fact as well as in legal theory, and bring the situation well within the decision in the Del. & Lack. Case (D. C.) 213 Fed. 240. It is true that this decree has recently (June 21, 1915) been reversed by the Supreme Court (238 U. S. 516, 35 Sup. Ct. 873, 59 L. Ed. 1438), but solely for a reason that does not rule the questions now presented for decision. As already stated, the Lackawanna Railroad was the owner and miner of the coal, and by an agreement with the Lackawanna Coal Company undertook to divest itself of title and interest before the carriage of the coal began. Upon the construction of this agreement the decision turned in the Supreme Court, and after its meaning. and effect had been ascertained, and the court had determined that it did not divest the railroad's interest in the coal, nothing remained but to apply the commodities clause to a situation that was embraced within the scope of its language. The following quotation from the opinion will sufficiently indicate that the· question regarded by the court as controlling was the construction of that agreement:

"1. But mere stock ownership by a railroad, or by its stockholders, in a producing company cannot be used as a test by which to determine the legality of the transportation of such company's coal by the interstate carrier. For, when the commodity clause was under discussion, attention was called to

the fact that there were a number of the anthracite roads which at that time owned stock in coal companies. An amendment was then offered which, if adopted, would have made it unlawful for any such road to transport coal belonging to such company. The amendment, however, was voted down; and, in the light of that indication of congressional intent, the commodity clause was construed to mean that it was not necessarily unlawful for a railroad company to transport coal belonging to a corporation in which the road held stock. United States v. Delaware & Hudson Co., 213 U. S. 414, 29 Sup. Ct. 527, 53 L. Ed. 836. For a stronger reason, it would not necessarily be illegal for the road to transport coal belonging to a corporation whose stock was held by those who owned the stock of the railroad company.

"Nevertheless, the commodity clause of the Hepburn Act of 1906 rendered unlawful many transactions which prior to that time had been expressly authorized by the statutes of the states which had chartered the coal roads. And, while the Hepburn Act provided that, in the future, interstate railroads should not occupy the dual position of carrier and shipper, there was, of course, no intent on the part of Congress to confiscate property or to destroy the interest of the stockholders. But still, upon adoption of the commodity clause, this appellee railroad was confronted with a difficult situation. To shut down the mines, because the coal could not be transported, would have meant, not only a vast monetary loss to the company and its stockholders, but would have been even more harmful to the interests of the public, which required a constant supply of fuel. The character of coal property was such as to make it impossible to divide the same in kind among the railroad stockholders, while the value of the coal land was so great as to make it impracticable to find a purchaser in ordinary course of trade. It was therefore natural, if not necessary, to organize a corporation with which a contract could be made, and out of cash received or stock issued to pay for or preserve the equity which the railroad shareholders had in the coal.

"In this situation there may have been no impropriety in the Railroad Company taking the preliminary steps of organizing such a corporation. Neither was it illegal for the stockholders of the Railroad Company to take stock in the Coal Company, for there are many instances in which the law recognizes that there may be diversity of corporate interest, even when there is an identity of corporate members. A city and the county, in which it is located, may both have the same population, but different corporate interests. Many private corporations have both stockholders and officers in common, yet they may nevertheless make contracts which will bind both of the separate entities. But whenever two such companies, thus owned or managed, make contracts which affect the interest of minority stockholders, or of third persons, or of the public, the fact of their unity of management must be considered in testing the validity and bona fides of the contracts under review.

"2. That principle is to be specially borne in mind in the present case. For this is not an instance of a coal road and a coal company, both of which existed and had made contracts prior to the commodity clause; but a case where a coal company was created with the express purpose that, with stockholders in common, it should be a party to a contract intended to enable the Railroad Company to meet the requirements of the commodity clause and at the same time continue the business of buying, mining, selling, and transporting coal.

"It is also to be noted that the Delaware, Lackawanna & Western Railroad Company did not part with title to its coal lands, mines, and mining machinery, as seems to have been done, on terms not fully stated (United States v. Delaware & Hudson, 213 U. S. 366, 398 [5], 29 Sup. Ct. 527, 53 L. Ed. 836), in some of the instances discussed in the Commodity Cases. In them the ownership of the mines had passed completely from the railroads to the producing companies, and the coal property was no longer subject to the debts of the railroad companies. After such sale of the coal lands there was both a technical and a practical separation of the legal interest of the two corporations in the coal under the ground, on the surface, when it was transported, and when it was sold. The fact that the railroad held stock in the producing

company, and received dividends thereon, did not give to the Railroad Company, any more than to any other stockholder in any other corporation, a le-¹ gal interest in the property of the Coal Company. Nor would the fact that the Railroad Company had once owned it have made any difference, if, by a normal and bona fide sale at the point of production, the carrier had lost all power of control and all right, title, and interest in the coal before the transportation began. United States v. Delaware & Hudson, 213 U. S. 413, top, 29 Sup. Ct. 527, 53 L. Ed. 836.

"3. But the decisions construing the statute recognize that one corporation can be an agent for another corporation, and that by means of stock ownership one of such companies may be converted into a mere agent or instrumentality of the other. United States v. Lehigh Valley R. R., 220 U. S. 257, 273, 31 Sup. Ct. 387, 55 L. Ed. 458. And this use of one by the other, or this power of one over the other, does not depend upon control by virtue of the fact that stock therein is held by the Railroad Company or by its shareholders. For dominance of the Coal Company may be secured by a carrier (New Haven R. R. v. I. C. C., 200 U. S. 363, 26 Sup. Ct. 272, 50 L. Ed. 515), not only by an express contract of agency, but by any contract which in its practical operation gives to the Railroad Company a control or an 'interest, direct or indirect,' in the coal sold, at the mouth of the mines.

"Assuming then that the incorporation and organization of the Coal Company under the auspices of the Railroad Company was legal; assuming that the election of railroad officers as the first managers of the Coal Company was not illegal; assuming that as officers of the Railroad Company they could contract with themselves as officers of the Coal Company; assuming that at the time of organization it was not unlawful for the Railroad Company and the Coal Company, not only to have officers, but offices, in common; and finally assuming that all these facts together did not, in and of themselves, establish an identity of corporate interest—still these facts taken together are most significant. They at least prove that the relation between the parties was so friendly that they were not trading at arm's length. And the further fact that one of the parties was under a statutory disability as to hauling coal makes it necessary to carefully scrutinize their arrangement, in order to determine whether it was a bona fide and lawful contract of sale, or a means by which the railroad, though parting with the legal title retained an interest and control in what had been sold."

Since the court did not discuss the constitutional questions referred to as "grave" questions by the opinion in U. S. v. Delaware & Hudson Co., 213 U. S. 367, 29 Sup. Ct. 527, 53 L. Ed. 836, it is clear that these were not regarded as necessary to the decision of the Lackawanna Case. Of course, these questions are not presented by this record either, if the conclusion we have reached is correct; whether they are presented in case that conclusion should be wrong, must be decided, not by us, but by the ultimate tribunal. The essential difference between the Lackawanna Case and this, as we have pointed out above, is that here there has been no change or attempted change of ownership or interest in the coal—the Railway has never owned it, or had any legal interest therein—and the questions presented appear to be those already referred to at the beginning of the discussion on this branch of the case. Following the authoritative decisions of the Supreme Court on this subject, we are of opinion that the commodities clause has not been violated by the Reading Companies.

We regret the delay in the decision of this very important dispute, but, while the Lackawanna Case was pending in the Supreme Court, it seemed desirable, and, indeed, almost imperative, to await the result in that tribunal. And we regret the length to which this discussion has extended; with every desire to shorten it, the need of stating the

case fully, in order to facilitate the review that will follow, has operated to prolong the examination—we can only hope, not unduly.

A decree may be prepared in accordance with this opinion.

## Supplemental Opinion.

PER CURIAM. As the parties have not been able to agree in all respects concerning the terms of the proposed decree, this memorandum may perhaps be useful.

1. They do not agree upon the question whether the charge in the bill, that the Central Railroad Company is violating the Commodities Clause by transporting the coal of the Lehigh & Wilkes-Barre Coal Company, should be unreservedly dismissed, or should be dismissed without prejudice. The position of the Railroad Company is that the charge should be unreservedly dismissed because the question is already res judicata. The facts to support the argument are these:

A similar charge was made against the Railroad Company in June, 1908, by a bill filed in the group of actions known as the First Commodities Cases. In the Circuit Court all the cases were submitted on bill and answer, accompanied by a stipulation that such "submission on bill and answer, and any averment or admission in the pleading of either party contained, shall in no wise prejudice the said parties in any other suit or proceeding heretofore or hereafter instituted, and shall be operative and take effect only with respect to the present suit and for the purposes thereof." The decrees of the Circuit Court dismissing the bills were entered in October, 1908, and in May, 1909, the Supreme Court reversed them and remanded the cases for further proceedings. United States v. Delaware & Hudson Co. et al., 213 U. S. 366, 29 Sup. Ct. 527, 53 L. Ed. 836. In March, 1910, the Circuit Court reinstated the suit against the Central Railroad Company, and the government moved for a decree that the bill be dismissed "without prejudice." This motion was heard upon the identical bill, answer, and stipulation that had previously been considered, and the Circuit Court was of opinion that the record did not show that the Railroad Company was violating the Commodities Clause as construed by the Supreme Court. The government's motion was therefore denied, and, after the Attorney General had declared that, in view of such denial he did not intend to proceed further in the Circuit Court, a second decree was entered dismissing the bill without qualification. The case was again taken to the Supreme Court, and the decree was affirmed. United States v. Erie R. R. Co. et al., 220 U. S. 275, 31 Sup. Ct. 392, 55 L. Ed. 464. The Supreme Court pointed out that the government had made no offer in the Circuit Court to show any further facts, and had not withdrawn the stipulation to submit the cause on bill and answer; saying that, as "leave to amend was not asked, and as upon the facts appearing and admitted on [the] record no violation of the Commodities Clause was shown, the decree entered may properly be held to have been in strict conformity with the opinion of this court."

This, of course, is an unequivocal declaration that upon the facts set forth by the bill and answer in that cause no violation of the Com-

modities Clause had been shown; and (if there were nothing else) the Central Railroad would no doubt be entitled to such protection as might properly be afforded in such a situation. But the bill and answer were only part of the record; the stipulation formed the other part, and of this the Supreme Court also took notice, as the following remark will show:

"Whatever, therefore, in view of the stipulation made below, may be the scope and effect of the decree as res judicata, we see no reason for concluding that error was committed by the Circuit Court in refusing to qualify its decree."

This decision was made in April, 1911 (United States v. Erie R. Co., 220 U. S. 275, 31 Sup. Ct. 392, 55 L. Ed. 464), and the suit before us was brought in September, 1913.

In the present action the charge of violating the Commodities Clause is brought against the Central Railroad Company for the second time, and upon the merits of that dispute we have not felt bound to pass. The obvious reason is that, if the Central Railroad Company were divorced from the Lehigh & Wilkes-Barre Coal Company, the question would cease to be important. Such a separation is provided for in the decree about to be entered, and therefore, whether the question be res judicata or not, the charge in the bill may properly be dismissed. But as we have not passed upon the merits, and are dismissing the charge for a different reason, we decline to consider now the question whether the Supreme Court finally settled the dispute in 1911. For the present the effect of that decision will be left undetermined. We cannot foresee the future; the situation may so change hereafter as to justify the government is raising the question again, and in that event the effect of the Supreme Court's ruling may then be presented for decision.

For the reason, therefore, that we have not passed upon the merits, we think the dismissal of the charge should not affect the government's right to proceed hereafter in case it shall be so advised. But we wish it to be understood, also, that in like manner our decree leaves unaffected the right of the Central Railroad Company to set up the defense of res judicata in such subsequent proceeding.

2. Neither do the parties agree completely about the method of dissolving the unlawful combination between the two coal companies. The Central Railroad Company asks us to consider the alternative proposition—that we should require the Reading Company to dispose of its stock in the Central, instead of requiring the Central to dispose of its interest in the Lehigh & Wilkes-Barre Coal Company. Undoubtedly some reasons exist in favor of such a course, but on the whole the other method seems to be preferable.

3. We agree with the government that the separation of interest between the Central Railroad Company and the Lehigh & Wilkes-Barre Coal Company should be effective, and to that end we think the bonds and other securities, as well as the stock, of the Coal Company should be disposed of.

4. And to the same end we think the Central Railroad Company should be enjoined (for the present at least) from compelling the Coal

Company to send its coal over the lines of the Railroad. As long as the union of interest between these two companies exists, this provision seems to be necessary.

5. We are not disposed to accept the government's suggestion to ask for the help of the Federal Trade Commission. We are unable to see any advantage in turning this matter over to the Commission, instead of dealing directly with it ourselves. The defendants can present their plan, as has been done in other cases, and we can then consider it in the light of such objections as may be made to it by any interest affected thereby, and can afterwards determine finally what course to adopt.

The principal matter in dispute is whether the individual stockholders of the Central Railroad Company (distinguishing them from the Reading Company and the other corporations defendant) should be permitted to acquire the stock, bonds, and other securities of the Coal Company, and on this point, also, we agree with the government. In our opinion the doctrine of the Union Pacific Case, 226 U. S. 470, 33 Sup. Ct. 162, 57 L. Ed. 306, calls upon us to deny the individual stockholders that privilege.

In accordance with the foregoing views the following decree will be entered:

### Final Decree.

This cause having come on for final hearing upon pleadings and proofs, and having been argued by counsel before three Circuit Judges, sitting under the provisions of the Expediting Act of February 11, 1903 (32 Stat. 823, c. 544, § 1), as amended by Act June 25, 1910, c. 428, 36 Stat. 854 (Comp. St. 1913, § 8824), and the pleadings, proofs, and arguments having been considered, and the opinion of the court having been filed, it is now, this ———— day of ————, 1915, ordered, adjudged, and decreed:

1. Except as hereinafter provided, the bill, or petition, is dismissed.

2. The charge therein contained—namely, that the lease of the Lehigh & Susquehanna Railroad made between the Lehigh Coal & Navigation Company and the Central Railroad Company of New Jersey, contained in the writings dated, respectively, March 31, 1871, May 27, 1883, and June 28, 1887, is in violation of the Anti-Trust Act of July 2, 1890 (26 Stat. 209, c. 647)—is not sustained, and in respect thereof the petition is dismissed. But in respect of all other charges against the Lehigh Coal & Navigation Company, and in respect of all charges against the Lehigh & New England Railroad Company, and the Lehigh & Hudson River Railway Company, the petition is dismissed without prejudice.

3. The charge that the Central Railroad Company is violating the Commodities Clause of the Act to Regulate Commerce (Act June 29, 1906, c. 3591, § 1, 34 Stat. 585 [Comp. St. 1913, § 8563]), is dismissed, but without prejudice.

4. The union of the Philadelphia & Reading Coal & Iron Company and the Lehigh & Wilkes-Barre Coal Company through the instrumentality of the Reading Company, a holding corporation— which owns the entire capital stock of the Philadelphia & Reading

Coal & Iron Company and a majority of the capital stock of the Central Railroad Company, the last-named company owning in turn a majority of the capital stock of the Lehigh & Wilkes-Barre Coal Company—is a combination in restraint of trade and violates the Anti-Trust Act of July 2, 1890 (26 Stat. 209, c. 647).

5. Within ——— days from the entry of this decree—or, in case an appeal be taken therefrom to the Supreme Court of the United States and duly prosecuted, then within ——— days after the filing in this court of the mandate of the Supreme Court affirming the decree—the defendants shall submit to this court a plan for the disposal by the Central Railroad Company of all the stock, bonds, or other securities of the Lehigh & Wilkes-Barre Coal Company now owned or in any manner controlled by it; the plan to be such as will effectually dissolve the unlawful combination and create a situation in harmony with law. If the defendants shall fail to present a plan within the period stated, or if the plan submitted shall be rejected, this court will take such further steps, by receivership or otherwise, as may then seem necessary, to dispose of the stock, bonds, and securities referred to, and to dissolve effectually the unlawful combination, so as to create a situation in harmony with law. For this purpose the court retains jurisdiction of the cause.

6. Pending the disposal of the stock, bonds, and securities referred to, the Central Railroad Company, the Reading Company, and all corporations controlled by them, or either of them, or subject to a common control with them, or either of them, through stock ownership or otherwise, their officers, directors, agents, and employés, are hereby enjoined from voting or attempting to vote on any stock of the Lehigh & Wilkes-Barre Coal Company, from collecting or receiving any dividends or interest upon its stock, bonds, or other securities, and from exercising or attempting to exercise any control, direction, supervision, or influence whatever over its acts, either by proxies from other stockholders or otherwise. And the Central Railroad Company, the Reading Company, and all corporations controlled by them, or either of them, or subject to a common control with them, or either of them, through stock ownership or otherwise, their officers, directors, agents, and employés, are perpetually enjoined from hereafter acquiring, directly or indirectly, any interest in or control over the stock, bonds, or other securities of the Lehigh & Wilkes-Barre Coal Company, or any control over said company. And the Central Railroad Company is hereby enjoined from requiring, or attempting or threatening to require, the Lehigh & Wilkes-Barre Coal Company or any of its subsidiary companies to ship all or any part of their coal tonnage over any railroad or line of transportation operated or designated by the Central Railroad Company.

7. All clauses, stipulations, or covenants in leases of coal lands made by the Philadelphia & Reading Coal & Iron Company, or by the Lehigh & Wilkes-Barre Coal Company, or by any company subsidiary to or controlled by either, that require or purport to require the lessees to ship coal over any particular railroad or railroads, or over such route as may be designated by any railroad or companies, are hereby declared

to violate the Anti-Trust Act of July 2, 1890, and therefore to be void; and the coal companies and the railroad companies that are parties to this decree, their officers, directors, agents, and employés, are hereby enjoined from enforcing or attempting to enforce, or threatening to enforce, such clauses, stipulations, or covenants.

8. The government is entitled to recover from the Reading Company so much of its taxable costs in the District Court as relate to the subject-matter of the fourth, fifth, and seventh sections of this decree.